MATTHEW CUNNINGHAM, PLAINTIFF IN ERROR, v. MARY W. W. ASHLEY, EXECUTRIX AND SOLE LEGATEE OF CHESTER ASHLEY, DECEASED, AND WILLIAM E. ASHLEY, FRANCES A. ASHLEY, (NOW FRANCES A. FREEMAN,) AND HENRY W. ASHLEY, BY MARY W W. ASHLEY, HIS GUARDIAN, HEIRS AT LAW OF SAID CHESTER ASHLEY, DECEASED, AND ROSWELL BEEBE.

On the 25th of December, 1824, Cunningham applied to the land-office at Batesville, in Arkansas, to become the purchaser of a quarter section of land under a Cherokee certificate which had become vested in him.

This application was refused, upon the ground that two New Madrid certificates had been laid upon the land in 1820. The right under these certificates was claimed by Ashley,

In 1830, Cunningham said that Brumbach had an improvement on the same quarter section, which Brumbach assigned to Ashley. The law sanctioned the division of a quarter section, under such circumstances.

In 1831, Cunningham claimed a preëmption right under the act of 29th May, 1830. The claims under this act, and under the Cherokee float were were not inconsistent with each other.

In 1838, two floats were entered upon the same quarter section, viz.: one by Plummer, for the east half of it, under the act of 1830, and the supplemental act of 1832; the other for the west half by Jenbeau, under the act of 1834, and the circular of the General Land-Office of 1837. Patents were issued, and the title became vested in Ashley.

The title of Cunningham is better than that derived from these floats. The title under the New Madrid certificates is not decided in this case, or affected in any way by the decision. Cunningham is therefore entitled to the half of the quarter section which he claimed separately from Brumbach.

The patents obtained by Ashley and Beebe, being founded upon entries which were void, are void also, so far as they interfere with the preëmptive right of Cunningham.

THIS case was brought up from the Supreme Court of the State of Arkansas, by a writ of error issued under the 25th section of the Judiciary Act.

The facts in the case were numerous and complicated, and a statement of the principal ones is given in the opinion of the court. It would not throw light upon any general principle if the reporter were to give a more particular account of the long series of acts which the respective parties considered to be the foundation of their respective titles. Nor would it be possible to explain the arguments of counsel, commenting on contradictory testimony, without a previous and detailed history of the transactions of twenty years. One of the briefs filed in the cause was upwards of seventy printed pages. The opinion of the court has given a selection of the leading facts in the case, so that its merits upon both sides can be clearly understood.

It was argued by *Mr. Lawrence* and *Mr. Pike,* for the plaintiff in error, and by *Mr. Bradley* and *Mr. Johnson,* for the defendants in error.

32 *

Mr. Justice McLEAN delivered the opinion of the court.

A writ of error to the Supreme Court of Arkansas, brings this case in Chancery before us, under the twenty-fifth section of the Judiciary Act.

On the 25th of December, 1824, Matthew Cunningham, by his attorney, applied to the Register of the Land-Office at Batesville, in Arkansas, to become the purchaser of the south-east quarter of section three, in township one, north, and in range twelve, west of the fifth principal meridian, south of the Arkansas River; by virtue of a certificate (No. 23) granted by the Register of the said land district, to William Wylee, assignee of William Morrison, under the act of 26th May, 1824.

That act provided that every person, entitled to the right of preëmption by law, in the tract of country north of the Arkansas River, which was ceded to the Cherokees, should be authorized, in lieu thereof, to enter with the above Register, any tract, in the Lawrenceville district, on which he may have made improvements, previously to the passage of the act; or, on any unimproved tract, within the district, the sale of which is authorized by law.

By several mesne assignments, the right of the Cherokee certificate was vested in Cunningham, and the land he proposed to enter, was, by law, authorized to be sold. The agent of the complainant informed the Register and Receiver, that he had the money, and was desirous of paying for the land; but, after consultation between the officers, he was informed the entry would not be permitted. The ground of this rejection was not stated, at the time, nor entered upon the records of either office. There can be no doubt, from the facts in the case, which appear in the correspondence of the General Land-Office, and otherwise, that the application to make the entry was rejected, on the ground that the land was covered by New Madrid locations. And it appears that two New Madrid certificates had been laid on the quarter section; one on the 19th of April, 1820, and the other on the 1st of May, of the same year.

On the 27th of May, 1831, the complainant claimed the right of preëmption to the same quarter section, under the act of the 29th of May, 1830. Being duly sworn, he stated, "that, in the year 1829, he had in cultivation about four acres, in corn and vegetables, on the land, and had been in possession of it near ten years; was in possession of it the 29th of May, 1830, and still occupied it." Several other witnesses proved the same facts, and one of them states, that he saw the complainant put down on the counter about two hundred dollars, and informed the Receiver that it was offered in payment of the land.

In the record, there is a list of the preëmptions allowed, at

the Land-Office at Batesville, by H. Boswell and J. Rodman, late Register and Receiver, from the 8th of January, 1831, to the 30th of June, in the same year, as appears from the papers of that office. In that list, the name of Matthew Cunningham stands first, as having entered the south-east quarter of section three, first township, north, twelfth range, west. It is certified by Townsend Dickinson, Register. On this paper the word "rejected" is found, but by whom written, and for what purpose, does not appear on the paper. The names of H. Boswell and J. Rodman, are under the word "rejected"; and several of the witnesses state, that the word "rejected," or "allowed," was indorsed on the envelop of preëmption papers, as the decision of the land-officers was made.

In the list is the name of Nathan Cloyes, claiming the preëmption right to the north-west fractional quarter of section two, in township one, north of range twelve, the claim to which was decreed to his heirs, in Lytle et al. *v.* the State of Arkansas et al. 9 Howard, 328.

There is, also, in the record, a certificate of Samuel W. Rutherford, Register of the Land-Office at Little Rock, where the papers of the Batesville officers are deposited, dated the 27th of December, 1837, which states, "that Matthew Cunningham was allowed, at the Land-Office at Batesville, (Lawrenceville land district,) a preëmption claim on the south-east quarter of section three, township one, north range twelve, west, as appears from the papers furnished this office from the Land-Office at Batesville, as having been allowed said Cunningham, prior to the 30th of June, of the same year." The year referred to was 1831, as stated in the above list of preëmption claims.

Various efforts were made by the complainant, at the Land-Office at Batesville, and at the General Land-Office, at Washington, to procure a full recognition of his preëmption claim. Appeals on the subject were made to the Secretary of the Treasury, and to the Attorney-General, all of which resulted in the denial of his claim, on the ground that the quarter section was not subject to a preëmptive right, by reason of the prior New Madrid locations.

It appears, from the record, that at the Land-Office at Little Rock, on the 6th of June, 1838, there was entered, by "Samuel Plummer, by virtue of his preëmption float, under the act of 1830, and the supplemental act of 1832, the east half of the south-east quarter of fractional section three, south of the Arkansas River, in township one, north of range twelve, west, containing eighty acres, &c., as per certificate granted to him, No. 3549." And that, on the same day, "Mary L. Jenbeau entered, by virtue of her preëmption float, under the act of 1834, and

circular of the General Land-Office, of the 9th of June, 1837, the west half of the south-east quarter of section three, in township one, north of range twelve, west, &c., as per certificate granted to her, No. 3554."

In their answers, the defendants say, "that they caused application to be made by legal and valid floating preëmption rights, fully authorized by law, to locate and enter said south-east quarter of section three, the same being then vacant public land, and liable, by law, to be entered by such floating rights; and this defendant, (Ashley,) in conjunction with said Beebe, caused the same to be entered, on the east half in the name of Samuel Plummer, and the west half in the name of Mary L. Jenbeau," &c. "Which said floating preëmption rights were located, entered, and transferred, according to law and all the lawful rules and regulations of the General Land-Office; and were duly patented to said Beebe, by the President of the United States, on the 25th of September, 1839."

On the 26th of December, 1838, the Commissioner of the General Land-Office, required the land-officers at Little Rock to inform him, " why entries 3549 and 3554, with two others, were permitted to be made on land already occupied by prior claims long since located, and against the validity of which this office possesses no evidence." In reply, dated 30th January, 1839, the land-officers stated, that the entries were permitted " upon the demand of Roswell Beebe, and the several allegations made by him, setting forth and showing, conclusively, that the Treasury Department had disallowed the preëmption claims under the act of 1814, upon all the lands south of the Arkansas River, ceded by the Quapaw treaties of 1818, and 1824," &c. And they say, " The original plat of survey embracing those entries, was, at the time, complete, and represented the subdivisional lines, and the number of acres corresponding respectively with those certificates of entry; and there was no evidence of record on file, in either of our offices, to show that these lands were ever regularly entered, or located, and due return made thereof, according to law, except such evidence as was exhibited by the preëmption, abstract from Batesville, under the act of 1814, and the coloring of the plat. The capitol of the State of Arkansas is built upon a portion of these lands, at a cost of some seventy thousand dollars, or more. The corporate authorities of the city of Little Rock, as well as the inhabitants, all hold under conveyances derived from, as under the preëmption claim, and against the New Madrid claims, either by a compromise made by the respective claimants about the year 1821, or, by the decision of the land-officers at Batesville, of which we are not particularly informed. All parties, within the limits of the

city, we believe, are fully satisfied that these entries which embrace it will cure the defects in their titles, as no dissatisfaction is believed to. exist with any one interested in the question. Those entries were therefore allowed by us upon due reflection, under the belief that we were acting correctly in the faithful discharge of our duties; and by which the individuals who supposed they rightfully claimed those lands, will be enabled to obtain a perfect title, and thereby save and protect the rights and titles of the numerous persons claiming under them, and to whom they are bound by obligation or deed."

In a letter from the Commissioner of the General Land-Office, dated the 24th of September, 1839, to the Register and Receiver at Little Rock, he says, " Your letter in reference to certain tracts of land located by floats 3549 and 3554, under the act of the 19th of June, 1834, has been received;" and he remarks, " after an attentive and careful examination of all the questions connected with the different claims preferred to the land above referred to, this office, on the 18th instant, transmitted to the Secretary of the Treasury, agreeably to his request, all the papers in reference to the case, with an opinion of this office in favor of a confirmation of these floats, regarding the bond filed by Roswell Beebe, as a sufficient compliance with the spirit of the circular of 11th of October, 1837; and I have this day received from him a communication concurring in that opinion.  Patents will, therefore, issue for certificates 3549 and 3554, and two other numbers stated."

The circular referred to by the Commissioner, in the above letter of the 11th of October, 1837, contains the following sentences : " The President of the United States has directed that, until the further action of Congress thereon, the rights of preemption of eighty acres of land elsewhere, usually called floating rights, granted by the second section of the act of Congress, approved May 29th, 1830, which act was revived and continued by the act approved June 19th, 1834, and which, also, as you were informed by my circular of June 9th, 1837, is for certain purposes therein stated, still in force; shall be restricted in their location to unimproved and vacant public land."

" You are therefore instructed not to permit the entry, by virtue of a floating right, of any tract on which there is a cultivation, improvement, settlement, or occupant, unless the owner of the float shall first produce to you the written consent thereto, of the person or persons claiming the same improvement, cultivation, settlement, or occupancy, attested by two witnesses."

The second section of the act of the 29th of May, 1830, provides, " that where two persons are settled upon the same quarter section, each may receive a preemption for eighty acres, and a.

right to enter eighty acres elsewhere, so as not to interfere with other settlers having a right of preference."

In his letter to the Secretary of the Treasury, "in favor of a confirmation of the above floats," the Commissioner says, "the claim of Matthew Cunningham, under the act of 26th of May, 1824, has heretofore been disposed of;" and further, "that the claims of Christian Brumbach and Matthew Cunningham, under the preëmption act of 29th May, 1830, have no validity. The report of the Register and Receiver, dated 20th July, 1839, and its accompanying papers, together with the Receiver's letter of the 25th July, 1839, with the inclosure, show that no action had been had on the claim of Christian Brumbach, by the land-officers; that no tender of the purchase-money was made by him, and no explanation can be given why his claim has been suffered to sleep from 1831 to 1839; and then only revived upon the rejection of the claim of Mrs. Backus, for the same quarter section under the act of 1838, who claims also to hold under Brumbach's claim of the act of 1830. Brumbach's own testimony shows, also, that he was living there by the permission of one of the proprietors of the town, and made the improvements for their benefit under a contract, and his deed of December 22d, 1824, accompanies those papers whereby those improvements were conveyed to Chester Ashley, one of the proprietors."

And further in relation to Cunningham's claim under the act of 1824, he says, it was rejected under the opinion of the Attorney-General; and remarks, "there is a strong point against the validity of that claim, which circumstances did not render it necessary heretofore to make, viz., that as the law of 26th May, 1824, granted the privilege of entering vacant land only, except where the preëmptor or his legal representatives was desirous of securing his own improvements made prior to the passage of the land, &c., and he argues that Cunningham should not be permitted to locate one hundred and sixty acres of land, to secure improvements on a few town lots."

On the 15th of July, 1839, it appears, by the certificate of the Receiver at Little Rock, that the complainant again tendered the sum of two hundred dollars, in payment of the quarter section in controversy.

As the legal title to the land in controversy is in the defendants, the right of the complainant can be sustained only by showing a paramount equity. This he has attempted to do. But before we enter upon this investigation, it may be proper to state, distinctly, the grounds on which the title of the respective parties will be considered. From the issue made by the pleadings, we do not consider the New Madrid locations, or any right under them, as involved in the case. They were necessarily set

aside, if not abandoned, by the defendants, when they located their floating rights on the land in controversy, on which patents were obtained. The right of the complainant has, from its origin, been hostile to the New Madrid claims.

The equity of the complainant must rest upon his occupancy and improvement of the land, whether he claims under the Cherokee warrant, or a preëmption under the act of 1830. The defendant's legal title will be considered as founded, exclusively on the locations made by the floating rights, on which the patents were obtained.

The two claims, set up by the complainant in his bill, require different facts, in the order of time, to sustain them; but they are in no respect inconsistent with each other. The Cherokee float could be located only on unoccupied land, or on land improved by the holder of the warrant.

As the land-officers at Batesville would not permit the complainant to make an entry under either claim, it is therefore important to ascertain on what ground they decided; and also as to the sufficiency of the evidence to sustain the right as claimed. There can be no question that the decision of these officers was founded on the prior New Madrid locations. These were made before the complainant took possession of the land. This, under the circumstances, being an insuperable objection to the entry, no court can presume that their decision was made on any other ground, unless such ground was stated, or the evidence was defective.

The voluminous correspondence of the General Land-Office shows, that the land-officers considered the above New Madrid locations as an appropriation of the land. Was the evidence adduced by complainant sufficient to establish his right?

The authority to Samuel C. Roane to make the entry, as the agent of Cunningham, under the act of 1824, was undoubted. The application to make the entry was made in due form. The Cherokee warrant had been issued by the land-officers, who were called upon to make the entry. The assignments upon the warrant were *primâ facie* evidence of right in Cunningham, and there does not appear to have been any objection to them; they must be considered, therefore, as having been held sufficient. The money on the entry was offered to be paid to the Receiver, and the only defect in the evidence was as to the improvements and occupancy of the complainants. These, it is contended, the court may presume were within the knowledge of the land-officers, or that the facts were proved by parol, or that they were proved by affidavits, which have become mislaid or lost. As the proof in the record, in regard to these facts, applies to the preëmption claimed under the act of 1830, there is no occasion to resort to presumptions on this head.

The preëmption act of the 29th of May, 1830, in the first section, provided, "that every settler or occupant of the public lands, prior to the passage of this act, who is now in possession, and cultivated any part thereof in the year 1829, shall be, and he is hereby authorized to enter, with the Register of the land-office for the district in which the lands may lie, by legal subdivisions, any number of acres, not more than one hundred and sixty, or a quarter section to include his improvement, upon paying to the United States the then minimum price of said lands."

Under this law the applicant was a witness, and Cunningham was interrogated by the land-officers on his application. He stated that in the year 1829, he cultivated about four acres on the quarter section claimed, and that he had been in possession of said improvement for near ten years, and that he was still in possession of it. And he further stated, Christian Brumbach had an improvement on the same quarter section which he had in cultivation, in the year 1829, and has continued to hold possession of the same to this time. This statement is corroborated by the oath of C. Brumbach, and as to the occupancy and improvement of complainant, by C. H. Pelham and Richard Searcy.

It is clearly shown, that the improvements of Cunningham, up to 1831, were wholly on the quarter section claimed; and that his cultivation and occupancy continued without interruption from the time he took possession in 1821, until the fall of the year 1831. He then removed to his present residence, the principal part of which is on the north-west quarter section, but a part, if not all, of his outbuildings, are on the south-east quarter. His former residence was south of his present one. The improvement he made at first is still cultivated by him.

As lot number one, on which the complainant's first house was built, was conveyed to Bertrand, his step-son, in 1821, by O'Harra, it is contended that the complainant had no such residence on the land, as to entitle him to preëmption. Bertrand was a minor, and lived with his step-father at the time, and it is quite clear, that a minor cannot claim a preëmptive right. But, in addition to this, as the case is now before us, it does not appear that O'Harra had any right to the lot conveyed.

It is objected that Cunningham's improvements, though on the quarter section claimed, are limited by the boundaries of a certain square, or lots, within the city of "Little Rock;" and that, consequently, he cannot claim a preëmption for the quarter section.

On the 20th of November, 1821, certain individuals, assuming to be owners and proprietors of the north-east fractional quarter

Cunningham v. Ashley et al.

of section number three, and of fractional section number two, of township number one, north of the base line in range number twelve west, entered into a deed of assurance, in which they agreed to lay out the town of Little Rock, specifying the streets and alleys, and making certain donations of public squares and lots for public purposes. This plat appears to have been surveyed so as to embrace the quarter section in controversy. In their answers, the defendants specify a number of lots sold in the south-east quarter, and they allege the greater part of it has been sold in lots. The proprietors in their deed say, that they extended the plat to adjoining lands not owned by them.

This survey of lots in the south-east quarter of section three, if made without authority, cannot embarrass the complainant's right. The New Madrid locations being out of the case, should the right of the complainant be sustained against the legal title of the defendants, the surveys must be considered as void. The town was incorporated in 1825, and, by the act of 1827, the corporation was extended so as to embrace the whole of the town plat.

When the improvement of the complainant was commenced, the south-east quarter was in its natural state, unchanged by any improvement.

Every legal requisite appears to have been complied with under the act of 1830, to entitle the complainant to a preëmption. His improvement and occupancy under the law were clearly proved. Indeed it would seem, from the facts, that he was entitled to become the purchaser of the land under the law of 1824. But all the facts, necessary to establish his right, were before the Register and Receiver on his second application. His application to make the entry may be said to have been rejected, because it was not allowed. But no doubt can exist as to the ground of the rejection. It was not on account of any deficiency in the proof, but on the ground of the New Madrid locations. This is placed beyond question, by the parol proof in the case, and the correspondence of the General Land-Office. Other objections to the claim, after the second rejection, were stated by that officer, which alleged a want of diligence by the complainant, in failing to do what he has proved was done, in the prosecution of his right. Some of these objections showed a misapprehension of the facts, others of the law.

The offices at Batesville were loosely kept, and it appears in proof that some year or two before his death, Boswell, the Register, became intemperate, and his duties were neglected. Great labor was required from his successor to reduce to system the confused mass of papers he found in the office.

It was the practice of the office to indorse on the envelop

of the preëmption papers, the decision, of which no other entry was made. And one of the witnesses states that "rejected" was indorsed on the envelop which inclosed the papers of Cunningham. It is difficult to reconcile this fact with two lists in the record, duly certified, of preëmptions allowed, in both of which the name of Cunningham is found. The word "rejected" is on one of the lists. There can be no doubt the claim was rejected as often as it was brought to the notice of the land department, so long as the New Madrid locations were sanctioned. No other decision could be made. But on the 6th of June, 1838, floats were permitted to be located on the quarter section in controversy, covered by the New Madrid locations. This was procured through the agency of the defendants, and for their benefit.

It was the result of a controversy of nearly twenty years' continuance. Since eighteen hundred and twenty-one, Cunningham had occupied the land, and had carried on the controversy with a commendable energy, and at no small expense of time and money. He urged his claim at the General Land-Office, personally, and by agents. The correspondence on the subject was earnest and voluminous. But the defendants, having made their entries, received the legal title. And their equity must now be compared with that of the complainants.

The New Madrid locations were controlled by the defendants. And they were not withdrawn, or the obstacle which they created removed, until the defendants' entries were made. The floats under which these entries were permitted, were issued under the act of 1830, continued in force by the act of 1834. The second section of the act declared that these floats should be so located, " as not to interfere with other settlers, having a right of preference." And the circular of the land-office directed that they " should be restricted to unimproved and vacant lands."

These stringent regulations were not sufficient to protect the rights of the complainant. His occupancy, improvements, and claim, were known to the defendants, and to all the officers of the government, who acted on the subject. They excused or justified themselves on the ground, that by permitting the entry to be made, many of the citizens of " Little Rock " would be quieted in their titles.

On the 6th of July, 1838, an instrument, under seal, was entered into between Roswell Beebe, to whom the patents were issued, of the one part, and the Mayor and Aldermen of the city of " Little Rock," in behalf of said city, as well as in behalf of the State of Arkansas, and also in behalf of any person or persons who may have in his own right a proper and regular chain

of conveyance or conveyances of any town lot or lots situated in the first original town, now city of "Little Rock," derived from, by, or under, any one or more of the original owners and proprietors of the town, as represented upon the first original plan as then surveyed and laid off into town lots, of the other part, witnesseth, that whereas the said Roswell Beebe has caused to be located and entered with preëmption floating claims, at the Land-Office at "Little Rock," and upon which the city, south of the Arkansas River, and west of the Quapaw line, is now built, the following described tracts or parcels of land, to wit, the north-east fractional quarter of fractional section three, and the west fractional part of the north-west and south-west fractional quarters of fractional section two, all in township one, north of the base line of range twelve west, &c. And in all cases, where purchases of lots had been made in the above tracts, Beebe bound himself to release to the purchasers.

This arrangement induced the land-officers to permit the entries to be made, as well on the south-east quarter in controversy, as on the tracts above described. And it was considered at the General Land-Office as a sufficient compliance with the circular of that office, dated the 11th of October, 1837. The patents on this view were issued to Beebe; and on the 11th of January, 1842, Beebe conveyed one half of the south-east quarter in controversy, to Ashley.

However satisfactory the agreement of Beebe may have been to claimants of lots on the tracts specified in his agreement, as it did not embrace the land claimed by the complainant, it was not designed for his benefit. And it is unaccountable that the land-officers at "Little Rock" and at Washington, should have considered the arrangement as a compliance with the regulation which prohibited the entry of floats upon improved or occupied land. And it is worthy of remark, that these locations were permitted to be made at "Little Rock," while the claimant was at Washington, prosecuting his claim.

Has the complainant placed himself in a position to object to the defendants' equity? He did every thing he could reasonably be required to do, to locate his Cherokee warrant on the land, under the act of 1824. Had it been objected, on that application, that he did not prove his improvement and occupancy, the witnesses would, at once, have been called. With this exception, he did every thing the law required to perfect his claim.

But, under the act of 1830, his proof was in no respect defective. It was worthy of the highest credit, and full to every point; and the money was offered to be paid. But the locations of the New Madrid warrants were an obstacle then, as they had been on the first application. These locations were not in the

way of defendants' floats, and it is not material to inquire by what means they were set aside. This being done, the rights of the complainant were paramount to those acquired under the new location. Those rights were founded on the settlement and improvement in 1821, and on the acts done subsequently in the prosecution of his claim. Having done every thing which was in his power to do, the law required nothing more. And the defendants who caused the floats to be located on the premises, had full notice of the complainant's rights. They are chargeable with this notice. Under the second section of the act of the 29th of May, 1830, and the circular of the Commissioner of the General Land-Office, of the 11th of October, 1847, so far as the new entries interfered with the rights of the complainant, they were void. They were in conflict with the law and the regulation.

The pretence that the agreement of Beebe, which bound him to execute deeds to the purchasers of lots, was a compliance with the above circular, so far as regards the land in controversy, was without foundation. It may have misled the officers at Washington, and in this it may have answered its purpose. The officers of the government are the agents of the law. They cannot act beyond its provisions, nor make compromises not sanctioned by it.

By the second section of the act of 1830, it is provided, " That if two or more persons be settled upon the same quarter section, the same may be divided between the two first actual settlers, if by a north and south, or east and west line, the settlement or improvement of each can be included in a half quarter section."

At the time the complainant applied for a preëmption under the act of 1830, he stated that Christian Brumbach had an improvement on the same quarter section, which he had in cultivation in the year 1829, and has continued to hold possession of the same to this time. And it was proved that Brumbach cultivated the land in 1830. The improvement occupied by complainant was commenced about the same time as the one occupied by Brumbach; and the evidence shows that they were the first settlers on the land. This we suppose, under the law, limits the preemption claimed by the complainant to one half of the quarter section. The residence and improvement of Brumbach brought him *primâ facie* within the law; whether he applied for and attained a preemption or not. It was necessary, under the regulations of the General Land-Office, that the complainant should state, in his applications, the occupancy, improvement, and cultivation of Brumbach, and whatever objection may be made to his preëmption claim by the govern-

ment, cannot enlarge the right of the complainant. Brumbach applied for a preëmption in the quarter section, under the act of 1830, and established his right in every thing, except the tender of the money. His claim was rejected, no doubt, on the same ground, as was that of the complainant's.

Brumbach had conveyed his right to Ashley, in whom the legal title is vested to one half of the quarter section. This removed the objection to the location of one of the floating rights for eighty acres on the quarter, as the improvement, if not made by Ashley, was owned by him. In regard to the one half of the quarter, the entry was not prohibited by the second section of the act of 1830, or the circular of 1837. To extend the preëmptive right of the complainant over the entire quarter, would cover improvements of another individual, made about the same time as those on which his preëmption is founded. This would disregard the express provision of the law, which gives to each settler, where there are two upon the same quarter section, eighty acres.

As the right set up by the complainant arises under an act of Congress, and the decision of the Supreme Court of Arkansas was against that right, this court has jurisdiction of the case.

We have not considered any right equitable or legal, as arising under the New Madrid locations, laid upon the land in dispute. Such right, if any existed, is not presented in the pleading, in such a form as to require its consideration an decision. It therefore remains wholly unaffected by the decree.

The facts in the case are exceedingly voluminous and complicated; but we have considered them, and the legal and equitable bearing they have upon the title of the parties. Upon this view, we are brought to the conclusion that the entries on which the defendants' patents were issued, were void, so far as they interfere with the claim of the complainant, for the reasons stated, and that, consequently, the patents are also void. The decree of the Supreme Court of Arkansas is therefore reversed; and the cause is remanded to that court, with instructions to enter a decree in pursuance of this opinion. And in order to give more definitely our views, we state, that, on a full consideration of the pleadings and proof in the case, we consider that the two entries of eighty acres each, made in the name of Samuel Plummer and Mary Louisa Jenbeau, on the south-east quarter of section number three, in township one north, and in range twelve, west of the fifth principal meridian, south of the Arkansas River, are void so far as they interfere with the preëmptive right of Matthew Cunningham to one half of the said quarter; and that Roswell Beebe, and the heirs of Chester Ashley, deceased, defendants, shall execute a deed of quitclaim

33 *

to the said Cunningham, on his paying or tendering to them the minimum price of the public land, with interest from the sixth of June, 1838, the time the above entries were made, to one half of the above quarter section, by east and west, or north and south lines, so as to include his improvement on the quarter section, or, if such a division cannot be made, that they convey to him, as aforesaid, a joint interest of one half in the quarter section.

And the court order that the decree shall in no respect affect any right which may or does exist, under the New Madrid locations, in the defendants or other persons, if any there be.

### Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Arkansas, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed, by this court, that the decree of the said Supreme Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded, to the said Supreme Court, for further proceedings to be had therein in conformity to the opinion of this court.