ROBINSON LYTLE AND LYDIA L. HIS WIFE, NATHAN H. CLOYES, AND OTHERS, PLAINTIFFS IN ERROR, *v.* THE STATE OF ARKANSAS, CHARLES B. BERTRAND, AND OTHERS.

Where the decision of a State court was against the validity of an entry of land which had been allowed by the proper officers of the United States, this court has jurisdiction, under the 25th section of the judiciary act, to revise that judgment, whether the invalidity was decreed upon a question of fact or of law.

The adjudication of the register and receiver is subject to revision in the courts of justice, on proof, showing that the entry was obtained by fraud and the imposition of false testimony on those officers, as to settlement and cultivation. This court has so decided heretofore.

Over the questions raised in the court below, of the effect of a bona fide purchase and of the statute of limitations, this court has no jurisdiction.

But the evidence shows that the entry was obtained by false affidavits as to residence and cultivation. The judgment of the Supreme Court of Arkansas is therefore affirmed.

THIS case was brought up from the Supreme Court of the State of Arkansas by a writ of error issued under the 25th section of the judiciary act. It was a chancery case, but correctly brought up by writ of error. See preceding case of Verden *v.* Coleman.

It was before this court at a preceding term, and is reported in 9 Howard, 314. It will be perceived, by referring to that case, that this court decided that the pre-emption act of 1830 conferred certain rights upon settlers upon public lands, upon proof of settlement or improvement being made to the satis-

faction of the register and receiver, agreeably to the rules prescribed by the Commissioner of the General Land Office. And their decision must be considered final, unless impeached on the ground of fraud or unfairness. 9 Howard, 333. The principal point now decided was, that the entry then recognised was obtained by false affidavits as to residence and cultivation.

The cause, as decided in 9 Howard, having gone back to Arkansas, the bill was amended, and various new parties, both complainants and defendants, were introduced. Most of the defendants answered; decrees were taken against some of those who did not answer, and the bills dismissed as to other.

The State court decided many questions upon which their decision was final, and not subject to be reviewed by this court under the 25th section of the judiciary act. The principal one before this court was, whether or not Cloyes imposed on the register and receiver by false affidavits as to cultivation and residence.

The case was argued in this court by *Mr. Bradley,* upon a brief filed by *Mr. Stilwell* and himself, for the plaintiffs in error, and by *Mr. Watkins* and *Mr. Pike* for the defendants in error, upon which side there was also filed a written argument by *Mr. Hempstead.*

The arguments which were filed were very voluminous, and the record contained nearly a thousand printed pages. The opinion of the Supreme Court of Arkansas was, that, from the proof in the cause, the pre-emption claim set up in the bill was and is fraudulent in fact and in law; and this was the judgment sought to be reversed by this court. The evidence upon the question constituted a large part of the record. The opinion of this court refers to a portion of it, and the residue of it the reporter does not intend to touch. The counsel for the plaintiff in error contended that the decree of the land officers, whilst it stands, is conclusive as to the title of the pre-emptioner and those claiming under him; that it could not be

impeached collaterally, but could be impeached for fraud only in a direct proceeding, by either an original or cross bill; and that, as the defendants had not so impeached or attempted to impeach it, they cannot be permitted to speak about fraud as a mere matter of defence.

18 Howard, 43, and authorities there cited.

The views of the counsel on both sides, upon the question of the jurisdiction of this court in this case, were as follows:

The counsel for the plaintiff in error said:

It may be insisted that this court has no jurisdiction of the case.

Had the Supreme Court of Arkansas simply affirmed the decree of the court of original jurisdiction, there would appear more plausibility in this; though, then, we think the jurisdiction clear.

The right set up by the plaintiffs in error arises under an act of Congress, and the decision of the Supreme Court of Arkansas was against that right; consequently, this court has jurisdiction of the case, without regard to the particular ground upon which the decree of the State court is based.

14 Howard's Rep., 389.

Cunningham v. Ashley et al., ib., 98.

1 Howard's Rep., City of Mobile v. Emanuel.

The right grows out of an act of Congress, and is sanctioned against all laws and judicial decisions of the States.

5 Cranch's Rep., 344, Owings v. Norwood's Lessee.

5 Peters's Rep., 257, Fisher's Lessor v. Cockerell.

It is sufficient that the validity of a treaty, or statute of, or an authority exercised under the authority of the United States, was drawn in question, and the decision was against their validity.

1 Wheaton's Rep., 304, 322, 352, Martin v. Hunter's Lessee, et seq.

3 Condensed R., 474. Same case.

The evidence for the defence was admitted, for the purpose of impeaching the right claimed under the act of Congress, and granted to them by the land officers acting under it;

consequently, the decision of the State court, upon the effect of such evidence, may be fully considered here, and the decree reversed or affirmed.

4 Howard's Rep., 447, Mackay *v.* Dillon.

The power to revise and reverse a decision of a State court, depriving a party of his right to transfer his case from a State court to a Circuit Court of the United States for trial, has been exercised.

14 Howard's Rep., 103, Gordon *v.* Longest.

In Neilson *v.* Lagow, 7 Howard's Rep., 775, the plaintiff claimed the land under an authority exercised by the Secretary of the Treasury in behalf of the United States, and the decision was against the validity of the authority thus exercised; and on motion to dismiss, Chief Justice TANEY said: "We think it is evidently one of the cases prescribed for in the twenty-fifth section of the act of 1789."

In this case, the decision was against an authority exercised by the register and receiver, subordinates of the Secretary of the Treasury, but under the same authority.

The jurisdiction exists wherever the laws of Congress and the acts of officers executing them in perfecting titles to public lands have been drawn in question and construed by the Supreme Court of a State, and the decision is against the title set up under the laws of Congress and the authority exercised under them.

19 Howard's Rep., 207, Cousin *v.* Blanc's Executors.

In McDonogh *v.* Millaudon, 19 Howard's Rep., 704, Mr. Justice CATRON said: "Did this final judgment draw in question the construction of a treaty or statute of the United States, or of an authority exercised under the same, and was the decision against the validity of either or against the title or right set up under either? If these questions are answered in the negative, it follows that we have no jurisdiction to reexamine or reverse the judgment under the twenty-fifth section of the judiciary act."

Hence, it must follow, necessarily, if answered affirmatively any one of them, the court would have jurisdiction. The plaintiffs in this case claim under the authority exercised

under a statute of the United States, and a right set up undei it, and the decision was against them.

Wynn *v.* Garland was similar to this in every respect, and the question was passed over without notice.

20 Howard's Rep., 7.

In order to give jurisdiction, it is sufficient, if the record shows, that it is clear from the facts stated, by just and necessary inference, that the question was made, and that the State court must, in order to have arrived at the judgment pronounced by it, have decided that question as indispensable to that judgment.

10 Peters Rep., 392, Crowell *v.* Randell.

1 id. Rep., 250, Wilson et al. *v.* the Blackbird C. M. Com pany.

1 Wheaton's Rep., 355, Martin *v.* Hunter's Lessee.

4 id. Rep., 311, Miller *v.* Nichols.

12 id. Rep., 117, Williams *v.* Norris.

The jurisdiction must be determined by reference to the record. And in doing so, the court will refer to the opinion of the State court, where it is made a part of the record by the laws of the State.

19 Howard's Rep., 207, Cousin *v.* Blanc's Executors.

In this case, there is no necessity, in the first instance, of looking behind the decree of the Supreme Court of Arkansas, to determine the ground of the decision; but, if need be, we may look back to the decision of the chancellor, whose decree was affirmed by the Supreme Court of Arkansas, and shall find that he overruled all the defences set up, except the invalidity of the pre-emption claim of Cloyes. (His opinion is made a part of the record—see Gould's Digest of the Laws of Arkansas, p. 242, sec. 17.) Certainly the fact that the Supreme Court decided against the right of the plaintiffs, upon the ground that it was fraudulent, cannot oust the jurisdiction. If that court had refused the relief because the proof showed that Cloyes never occupied or cultivated the land, the case would be the same; because the want of possession and cultivation, in the eyes of that court, constituted the fraud. The idea of fraud cannot be disconnected from the act of Congress.

If there was any fraud, it was a fraud upon the law, and upon the United States through her land officers.

The decision being against the right, the Supreme Court has jurisdiction to re-examine the case, and determine, not whether the decision was right upon the particular ground, but whether the right was properly denied. The decree of the State court would not have been what it is, if there had not been a decision against the right set up by the plaintiffs; and this is all sufficient.

12 Howard Rep., 124, Williams *v.* Oliver et al.

3 Peters Rep., 292, 302.

And the decision of the State court need not be confined exclusively and especially to the construction of the treaty act of Congress, &c., in order to give jurisdiction.

12 Howard Rep., 124, Williams *v.* Oliver.

Points may arise, growing out of and connected with the general question, and so blended with it as not to be separated, and therefore falling equally within the decision contemplated by the twenty-fifth section. The case of Smith *v.* the State of Maryland, 6 Cranch, 281, and Martin *v.* Hunter's Lessee, 1 Wheaton, 305, 355, afford illustrations of this principle.

Here the record shows affirmatively that the decision was against the right set up and the authority of the land officers, excluding the idea that the decision was made upon the other defence set up by the defendants, such as purchasers for a valuable consideration without notice, statutes of limitation, lapse of time, &c. And it follows, as a matter of course, that if the decision of the State court upon that point was wrong, the decree must be reversed.

The counsel for the defendant in error, *Mr. Watkins,* made the following point upon the question of the jurisdiction of this court in this case:

On a writ of error from a State court, where no question of law is presented, it is not the province or duty of this court to review the decision of an issue of fact merely, made by the court below, with its superior facilities for determining the fact according to the weight or credibility of testimony.

By the judiciary act of 1789, appeals were only allowed from the District to the Circuit Courts. There was no mode of bringing up any case to this court, except by writ of error.

Blain *v.* Ship Carter, 4 Dallas, 22.

The terms, appeal and writ of error, though used by the act, were not confounded. An appeal is à civil-law proceeding, which removes the cause entirely, and is a rehearing on the facts as well as the law.

Wischart *v.* Danchy, 3 Dallas, 321.

The great object of the judiciary act of 1789 was to confine the appellate jurisdiction of this court to the examination and decision of questions of law, on errors assigned and made to appear upon the record. By section nineteen, the Circuit Courts in equity were required to cause the facts, upon which they founded their decree, to appear upon the record, either by a statement of such facts by the parties, or by the court where they could not agree, being analogous to a special verdict or case stated in trials at law. This regulation appears to have been regarded with some jealousy, according to the report of the case last cited, (Wischart *v.* Danchy,) as conferring a power on the Circuit Courts in chancery, which might be abused by a determination of facts contrary to or not warranted by the evidence. That feeling probably led to the passage of the act of 3d March, 1803, providing for an appeal, in chancery causes, from the Circuit Courts to this court, and that on such appeal the transcript should contain all the pleadings, depositions, and documentary evidence, in the cause.

The policy of the act of 1803, as apparent from its history, was, to enable this court to review and correct any gross error of the Circuit Courts, in determining questions of fact, against or without evidence. The principle pervading the exercise of appellate jurisdiction by this court is only partially innovated upon. I apprehend that no appeal in chancery was ever decided by this court, without deference to the opinion of the Circuit Court, which tried the cause upon the facts which the evidence conduced to establish; while, on the other hand, their errors or misconstructions of law are freely examined. And considering that in theory, and usually in prac-

tice, a justice of this court presides at the circuit, he has all the opportunities afforded in equity and admiralty causes, for arriving at a just conclusion upon the facts.

In all the cases from Parsons *v.* Bedford, 3 Peters, 444, (where this court refused to give efficacy to the act of 26th May, 1824, as an entering wedge for the civil-law practice of Louisiana, whereby this court would be called on to re-examine facts ascertained in the court below,) to Minor *v.* Tillotson, 2 Howard, 392, and Fenn *v.* Holme, 21 Howard, 481, this court has perseveringly resisted all efforts to engraft upon the Federal Judiciary the civil-law practice, or the mongrel systems of Texas and other new States.

But, in any view of it, the act of 1803 does not apply to writs of error from a State court, under the 25th section of the judiciary act. And according to the construction repeatedly given by this court, touching the distinction between an appeal and a writ of error, where those terms are used in acts of Congress, nothing is examinable on a writ of error by this court, as one of appellate jurisdiction, except questions of error in law. In view of the tendency of modern law reforms, so called, to make law equity, to assimilate pleadings in all civil causes to the chancery forms of a complaint, answer, and reply, and bring upon the record a crude mass of testimony, it seems proper for this court to consider whether such innovations shall be suffered to impair its own usefulness. The time, the learning, and ripe experience of the judges of the highest appellate court in the world belong to the country, and need not be wasted in the investigation of paltry questions of fact, which are of no concern beyond the immediate parties to the dispute. The imposition of such a duty would not only be subversive of the theory of appellate jurisdiction, but is one which an appellate court is not competent to perform. When this cause was tried in 9 Howard, the facts confessed by the demurrer lay in a nut-shell. The decision is interesting and important as an affirmance of the doctrine, that an inchoate right of pre-emption vested under law is not defeated by a subsequent act of Congress granting the land. But on this record, suppose the court here to enter upon a re-examination of facts, and after

a patient and laborious collation of the testimony, and without indeed those aids attendant upon the court which tried the cause, and breathing the atmosphere of the witnesses, could instinctively appreciate their worth or credibility, should arrive at the conclusion that the claim of Cloyes was unfounded in fact, and fraudulent, the decision, settling no question of law, would not be worthy of a place in the reports. I take it, that amid all changes and fluctuations in the jurisprudence of the States, the principle governing 'the appellate jurisdiction of this court should remain unchanged; so that whatever mode of trial may be provided in the local tribunals, and to which the parties have resorted, the ascertainment of a fact, according to the mode provided, is to be regarded as final and conclusive of the fact.

I venture to submit, that it is only according to a technical veiw of the judiciary act that this court has any jurisdiction in the premises. It is true, that because the plaintiffs in error claim under a law of Congress, and the decision is against the right claimed, they come literally within the terms of the 25th section; so that the court, according to its practice, might refuse to entertain a motion to dismiss for want of jurisdiction, and out of abundant caution reserve the question until the final argument. Doubtless, if the plaintiffs in error can put their finger on any error or misconstruction of law by the chancellor in the determination of the fact, or, in other words, can show that he regarded those acts of the claimant as fraudulent, which, in the opinion of this court, and according to its construction of the law, were not so, then the decision of the court below would be examinable for that error. But, apart from the consideration of all other elements of *mala fides*, one essential fact, ascertained and decided by the court below, is, that Cloyes did not cultivate in 1829. While that determination stands, there never was any right, and consequently there is no jurisdiction.

Finally, if it be the pleasure of the court to go into a re-examination of the entire testimony, the defendants in error, whom I represent, confidently invite it, and are content to refer to the exposition of the evidence contained in the decis-

ions of the chancellor and Supreme Court of Arkansas, and in the argument of Mr. Hempstead.

Mr. Justice CATRON delivered the opinion of the court.

The first question presented on the record is, whether this court has jurisdiction to examine and revise the decision of the Supreme Court of Arkansas by writ of error, under the 25th section of the judiciary act? The question arises on the following facts:

Nathan Cloyes, ancestor of the principal complainants, entered as an occupant, at a land office in Arkansas, a fractional quarter section of land, in 1834, under the pre-emption acts of 1830 and 1832. The fraction adjoined the village of Little Rock on its eastern side, and was for twenty-nine acres. The same land had been patented in 1833 by the United States to John Pope, Governor of the Territory of Arkansas, to be appropriated to the erection of public buildings for said Territory. The heirs of Cloyes claimed to have an earlier equity, by force of their pre-emption right, than that of the Governor of Arkansas.

They filed their bill in equity in the proper State court, to enforce this equity. That bill contained appropriate allegations to exhibit an equitable title in the plaintiffs, and the opposing right of the patentee, and thus to enable the courts to compare them. Some of the defendants demurred to the bill; others answered, denying the facts of the settlement and cultivation, and pleading the bona fides of their purchase and the statute of limitations.

The courts of Arkansas dismissed the bill on the demurrer; which judgment was reversed in this court, and the cause remanded for further proceedings. Lytle v. Arkansas, 9 How., 314. It was prepared for hearing a second time, and the courts of Arkansas have again dismissed the bill, and the cause is a second time before us.

The cause was fully heard on its merits below; and the claim of Cloyes rejected, on the ground that he obtained his entry by fraud in fact and fraud in law; and the question is, can we take jurisdiction, and reform this general decree? It

*rejected the title* of Cloyes; and, in our opinion, it is not material whether the invalidity of the title was decreed in the Supreme Court of Arkansas upon a question of fact or of law. The fact that the title was rejected in that court authorizes this court to re-examine the decree. 14 Peters, 360.

The decision in the Supreme Court of Arkansas drew in question an authority exercised under the United States, to wit: that of admitting Cloyes to make his entry; and the decision was against its validity, and overthrew his title, and is therefore subject to be re-examined, and reversed or affirmed in this court, on all the pleadings and proofs which immediately respect the question of the proper exercise of authority by the officers administering the sale of the public lands on the part of the United States.

In the case of Martin against Hunter's Lessee, (1 Whea., 352,) the foregoing construction of the 25th section of the judiciary act of 1789 was recognised, and has been followed since, in the cases of Choteau against Eckhart, (2 How., 372,) Cunningham against Ashley, (14 How., 377,) Garland against Wynn, (20 How., 6,) and other cases.

Another preliminary question is presented on this record, namely: whether the *adjudication* of the register and receiver, which authorized Cloyes's heirs to enter the land, is subject to revision in the courts of justice, on proof, showing that the entry was obtained by fraud and the imposition of false testimony on those officers, as to settlement and cultivation. We deem this question too well settled in the affirmative for discussion. It was so treated in the case of Cunningham against Ashley, (14 How., 377;) again, in Bernard against Ashley, (18 How., 43;) and conclusively, in the case of Garland against Wynn, (20 How., 8.)

The next question is, how far we can re-examine the proceedings in the State courts.

In their answers, the respondents rely on the act of limitations of the State of Arkansas for protection. As this is a defence having no connection with the title of Cloyes, this court cannot revise the decree below in this respect, under the 25th section of the judiciary act.

*Lytle et al. v. State of Arkansas et al.*

Many of the defendants also relied in their answers on the fact that they were bona fide purchasers of the lots of land they are sued for, and therefore no decree can be made here to oust them of their possessions. The State courts found that a number of the respondents were purchasers without notice of Cloyes's claim, and entitled to protection as bona fide purchasers, according to the rules acted on by courts of equity. With this portion of the decree we have no power to interfere, as the defence set up is within the restriction found in the concluding part of the 25th section, which declares "that no other error shall be assigned or regarded by this court as a ground of reversal, than such as immediately respects the before-mentioned questions of validity or construction of the Constitution, treaties, statutes, commissions, or authorities, in dispute." Mr. Justice Story comments on the foregoing restraining clause, in the case of Martin *v.* Hunter's Lessee, (1 Whea., 358,) which construction we need not repeat.

Whether Cloyes imposed on the register and receiver by false affidavits, when he made proof of cultivation in 1829, and residence on the land in dispute on the 29th of May, 1830, is the remaining question to be examined. He made oath (23d April, 1831) that he did live on said tract of land in the year 1829, and had done so since the year 1826. Being interrogated by the register, he stated: I had a vegetable garden, perhaps to the extent of an acre, and raised vegetables of different kinds, and corn for roasting-ears; and I lived in a comfortable dwelling, east of the Quapaw line on the before-mentioned fraction. Being asked, did you continue to reside, and cultivate your garden aforesaid, on the before-named fraction, until the 29th of May, 1830? he answers: "I did; and have continued to do so until this time."

John Saylor deposed on behalf of Cloyes in effect to the same facts, but in general terms. Nathan W. Maynor and Elliott Bursey swore that the affidavit of Saylor was true On the truth or falsehood of these depositions the cause depends.

In opposition to these affidavits, it is proved, beyond dispute, that Cloyes and his family resided at a house, for a part of the

year 1828, occupied afterwards by Doctor Liser. In the latter part of 1828, they removed from that place to some log cabins, situate on the lots afterwards occupied by John Hutt, and where the Governor of Arkansas resided in 1851, when the witnesses deposed. Both places were west of the Quapaw line—the cabins standing probably one hundred yards west of the line, and which line was the western boundary of the fractional quarter section in dispute. Cloyes resided at these cabins when he swore at Batesville, before the register; and continued to reside there till the time of his death, which occurred shortly after his return from Batesville, say in May or June, 1831, and his widow and children continued to reside at the same cabins for several years after his death.

Cloyes was by trade a tinner, and in December, 1826, rented of William Russell a small house, constructed of slabs set upright, in which he carried on his business of a tin-plate worker. He covenanted to keep and retain possession for Russell of this shop against all persons, and not to leave the house unoccupied, and to pay Russell two dollars per month rent, and surrender the house to Russell or his authorized agent at any time required by the lessor.

Under this lease, Cloyes occupied the house until the 19th day of June, 1828, when he took a lease from Chester Ashley for the same, and also for a garden. He covenanted to pay Ashley one dollar per month rent; to put and keep the building in repair; to keep and retain possession of the same, until delivered back to said Ashley by mutual consent, either party having a right to terminate the lease on one month's notice. The house and garden were rented by the month.

Under this lease, Cloyes occupied the house, as a tin-shop, to the time of his death. Both the leases state that the shop was east of the Quapaw line, and on the public lands.

This slab tenement was built by Moses Austin, about 1820. On leaving Little Rock, he sold it to Doctor Mathew Cunningham; it passed through several hands, till it was finally owned by Col. Ashley. Buildings and cultivated portions of the public lands were protected by the local laws of the Arkansas Territory; either ejectment or trespass could have

been maintained by Ashley against Cloyes to recover the premises, nor could an objection be raised by any one, except the United States, to these transfers of possession—neither could Cloyes be heard to disavow his landlord's title. He held possession for Ashley, and was subject to be turned out on a month's notice to quit.

Cunningham and other witnesses depose that the shop rented to Cloyes stood west of the Quapaw line. It however appears, from actual survey, that it was on the section line, which ran through the house, taking its southeast corner on the east side, but leaving the greater part of the shop west of the line.

Another pertinent circumstance is, that when Cloyes heard the pre-emption law of 1830 was about to pass, or had passed, (it is uncertain which, from the evidence,) he removed his wife and children, with some articles of necessary furniture, to the tinner's shop, from his residence at the Hutt place, and kept his family at the shop for a few months, and then they returned to their established home. This contrivance was probably resorted to at the instance of Benjamin Desha, who had agreed with Cloyes to pay into the land office the purchase money, and all incidental expenses, to obtain a title from the Government for an interest of one-half of the land. These evasions were mere attempts to defraud the law, and to furnish some foundation for the necessary affidavits to support his pre-emption claim at the land office.

On this aspect of the case, the question arises, whether Cloyes's possession as lessee and tenant of Ashley, occupying a shop as a mechanic, the corner of which accidentally obtruded over the section line, upon the public land, and who was subject to removal by his landlord each month, was "a settlement" on the public lands, within the true intent and meaning of the act of May, 1830?

That Cloyes never contemplated seeking a home on the public lands as a cultivator of the soil, is manifest from the proof; he worked at his trade, when he worked at all, (say the witnesses,) and followed no other avocation. Our opinion is, that the affidavits, on which the occupant entry was found-

ed, were untrue in fact, and a fraud on the register and receiver; and that Cloyes had no bona fide possession as tenant of the tinner's shop, within the true meaning of the act of 1830.

We are also of opinion, that the affidavits are disproved, as respects the fact of cultivation in 1829. There was no garden cultivated in that year, adjoining or near to the shop. To say the least, it is quite doubtful whether there was such cultivation east of the Quapaw line; and the State courts, having found that there was none, it is our duty to abide by their finding, unless we could ascertain, from the proof, that they were mistaken, which we cannot do; our impressions being to the contrary.

The question of cultivation in May, 1830, depended on parol evidence of witnesses. The judges below knew them; they decided on the spot, with all the localities before them; and as the evidence is contradictory, it would be contrary to precedent for this court to overrule the finding of a mere fact by the courts below.

On the several grounds stated, we order that the decree of the Supreme Court of Arkansas be affirmed, with costs.

Mr. Justice McLEAN and Mr. Justice CLIFFORD dissented.

Mr. Justice McLEAN:

I dissent from the opinion of the court, as now expressed, and shall refer to the former opinion, to show the nature of the case:

"After the refusal of the receiver to receive payment for the land claimed, an act was passed, 14th July, 1832, continuing the act of the 29th May, 1830, and which specially provided that those who had not been enabled to enter the land, the pre-emption right of which they claimed, within the time limited, in consequence of the public surveys not having been made and returned, should have the right to enter such lands, on the same conditions in every respect as prescribed in said act, within one year after the surveys shall be made and re-

turned. And this act was in full force before Governor Pope selected said lands. That the public surveys of the above fractional sections were made and perfected on or about the 1st of December, 1833, and returned to the land office the beginning of the year 1834. On the 5th of March, 1834, the complainant paid into the land office the sum of $135.76¼, in full for the above-named quarter section."

That a certificate was granted for the same, " on which the receiver endorsed, that the northwest fractional quarter section two was a part of the location made by Governor Pope in selecting 1,000 acres, adjoining the town of Little Rock, granted by Congress to raise a fund for building a court-house and jail for the Territory; and that the endorsement was made by direction of the Commissioner of the General Land Office." " That the register of the land office would not permit the said fractional quarter sections to be entered."

It appeared that " the patentees in both of said patents, at the time of their application to enter the lands, had both constructive and actual notice of the right of Cloyes, and that the present owners of any part of these lands had also notice of the right of the complainants."

In his dissenting opinion, Judge Catron says: " The proof of occupancy and cultivation was made in April, 1831, under the act of 1830, pursuant to an instruction from the Commissioner of the General Land Office having reference to that act. The act itself, the instruction under its authority, and the proofs taken according to the instruction, expired and came to an end on the 29th May, 1831. After that time, the matter stood as if neither had ever existed; nor had Cloyes more claim to enter from May 29, 1831, to July, 1832, than any other villager in Little Rock."

Now, although it may be true that, until the act of 1832 had passed, the act of 1830 having expired, the pre-emptive right of Cloyes could not be perfected, yet the policy of the law was, where vested rights had accrued, which, by reason of delays in the completion of surveys, could not be carried out, the Government gave relief by extending the law. And the inchoate right was secured by the policy of the Government. It

is therefore not strictly accurate to say, the party entering a pre-emption has no right. He has a right, recognised by the Government, by which he is enabled to perfect his right; and, under such circumstances, no new entry could interfere with a prior one, though imperfect.

This court say, the proof of the pre-emption right of Cloyes being entirely satisfactory to the land officers, under the act of 1830, there was no necessity of opening and receiving additional proof under any of the subsequent laws. The act of 1830 having expired, all rights under it were saved by the subsequent acts. No steps which had been taken were required again to be taken.

Did the location of Governor Pope, under the act of Congress, affect the claim of Cloyes? On the 15th of June, 1832, one thousand acres of land were granted, adjoining the town of Little Rock, to the Territory of Arkansas, to be located by the Governor. This selection was not made until the 30th of January, 1833. Before the grant was made by Congress of this tract, the right of Cloyes to a pre-emption had not only accrued, under the provisions of the act of 1830, but he had proved his right, under the law, to the satisfaction of the register and receiver of the land office. He had, in fact, done everything he could do to perfect this right. No fault or negligence can be charged to him.

"By the grant to Arkansas, Congress could not have intended to impair vested rights. The grants of the thousand acres and of the other tracts must be so construed as not to interfere with the pre-emption of Cloyes."

From the citations above made in the original opinion in this case, the following facts and principles of law are too clear to admit of doubt by any one:

1. That Cloyes's pre-emption to fractional quarter section No. 2 was clearly established, by the judgment of the land officers and of this court.

2. That the location of Governor Pope, being subsequent to the right of Cloyes, could not affect, under the circumstances, that right, and that the conveyance was subject to it. This appears by the certificate of the land office, by the uniform

action of the Government in all such cases, and the good faith which has characterized the action of Government, in protecting pre-emption rights, by giving time to protect such right, where the Government officers had failed in doing their duty. And in addition to these considerations, in the solemn declaration of this court, "that Congress could not have intended to impair vested rights." And the court say, "the grants of the thousand acres and of the other tracts must be so construed as not to interfere with the pre-emption of Cloyes." ·

This court say, "The Supreme Court of the State, in sustaining the demurrers and dismissing the bill, decided against the pre-emption right claimed by the representatives of Cloyes; and as we consider *that* a valid right as to the fractional quarter on which his improvement was made, the judgment of the State court was reversed."

"Now, the defendants demurred to the original bill, which they had a right to do, and rest the case on the demurrer's appearing on the face of the bill. But this court held Cloyes's right valid, and consequently reversed, on this head, the judgment of the State court. And the cause is transmitted to the State court for further proceeding before it, or as it shall direct on the defence set up in the answers of the defendants, *that they are* t *ona fide purchasers of the whole or parts of the fractional section in controversy, without notice,* and that that court give leave to amend the pleadings on both sides, if requested, that the merits may be fully presented and proved, as equity shall require."

Now, it is perfectly clear that nothing was transmitted under the direction of this court to the State court, except the latter part of the sentence beginning, "*and the cause is transmitted to that court,*" &c. And that part relates wholly to the inquiry whether the defendants were bona fide purchasers of the whole or parts of the fractional section in controversy. And for this purpose, leave was given to amend the pleadings.

If there is anything in this bill which afforded any pretence to the State court to open the pleadings, and examine any matters in the bill, except those specified in its close, it has escaped my notice.

It is said in the bill, "the register and receiver were constituted, by the act, a tribunal to determine the right of those who claimed pre-emptions under it. From their decision no appeal was given. If, therefore, they acted within their powers, as sanctioned by the commissioner, and within the law, the decision cannot be impeached on the ground of fraud or unfairness; it must be considered final."

The court here was speaking of its own powers of jurisdiction and investigation, and not the powers of any other tribunal. It was supposed that no superior court would willingly permit its judicial powers to be subverted, new parties made, new subjects introduced, and the whole proceedings reversed, at the will of an inferior jurisdiction, without the exercise of a controlling power.

This State record of Arkansas seems to have been a prolific source of controversy, as its proportions have grown to about a thousand pages, not including briefs and statements of facts. It certainly must require some skill in legislation, to draw into the State court so large an amount of business under the laws of Congress. And it may become a matter of public concern, when such a mass of judicial action is not only thrown into the State court, but new rules and principles of action are liable to be sanctioned, in disregard of the laws of the United States.

Without any authority, it does appear that the judgment of the Supreme Court has been reversed by the Arkansas court, its proceedings modified in disregard of its own judgments and opinions clearly expressed, and new rules of proceedings instituted and carried out; and this under an authority given to the Arkansas court to ascertain whether certain purchases had been made bona fide.

Cloyes, in his lifetime, by his own affidavit, and the affidavits of others, made proof of his settlement on, and improvement of, the above fractional quarter, according to the provisions of the act, to the satisfaction of the register and receiver of said land district, agreeably to the rules prescribed by the Commissioner of the General Land Office; on the 20th May, 1831, Hartwell Boswell, the register, and John Redman, the

receiver, decided that the said Cloyes was entitled to the pre-emption right claimed. "On the same day, he applied to the register to enter the northwest fractional quarter of section two, containing thirty acres and eighty-eight hundredths of an acre." But the register very properly decided that Cloyes could only be permitted to enter the fraction on which his improvement was made.

The Commissioner of the General Land Office, and the register and receiver, declare they were satisfied with the proof made in the case; but the Supreme Court of Arkansas decided against the pre-emption right claimed by the representatives of Cloyes; and the Supreme Court of the United States say, "as we consider *that* a valid right as to the fractional quarter on which the improvement was made, the judgment of the State court is reversed."

How does this case now stand? It stands reversed upon our own records by the Supreme Court of Arkansas, and by no other power. A majority of this bench entered the judgment, as it now stands, in 1849. But, through the reforming process, of a record of a thousand pages, not including notes and statements of facts, it has become a formidable pile, enough to fill with despair the first claimant of the pre-emption right.

It is true, the cause was sent down for a special purpose, every word of which I now copy:

"And the cause is transmitted to that court (the Supreme Court of Arkansas) for further proceedings before it, or as it shall direct, on the defence set up in the answers of the defendants, that they are bona fide purchasers of the whole or parts of the fractional sections in controversy, *without notice,* and that that court give leave to amend the pleadings on both sides, if requested, *that the merits of the case* may be fully presented and proved, as equity shall require."

Several of the defendants alleged they were bona fide purchasers of a part or the whole of the fraction, without notice; and the object in sending the case down was to enable persons to show they were purchasers of this character. This did not necessarily involve fraud. And this embraces the whole subject of inquiry.

It would have been inconsistent for this court to say, we consider the pre-emption claim by the representatives of Cloyes as a valid right, as to the fractional quarter on which his improvement was made, and on that ground to reverse the judgment of the State court, and at the same time send the case down, open to the charge of fraud and every conceivable enormity. The object was to know who were purchasers without notice. That this was the intention of the Supreme Court, is palpable from the language of the entry.

The majority of the Supreme Court had full confidence in the validity of Cloyes's claim, and consequently they reversed the judgment of the State court, leaving the question open, whether the defendants were purchasers without notice. It may be that this entry would have protected all the purchasers.

From the nature of pre-emption rights, it is presumed, a person desirous of such a right is the first applicant. And the proof of such a right, if sustained by the register and receiver and the Commissioner of the Land Office, the proof required, is deemed satisfactory. It is only where a fortunate selection appears to be made, by the prospect of a city, or some great local advantage is anticipated, that a contest arises as to such a claim.

The officers of the land department, whose peculiar duty it was to protect the public rights, seemed to have discharged their duty to the satisfaction of the Government. This was also entirely satisfactory to a majority of the judges of this court, with the single exception, that, from the answers, it was probable that there may have been purchasers of this right without notice. And from the evidence introduced, it would seem to have been considered that any one who at any time desired to purchase, considered himself as having a right to complain, although he had no means to make the purchase, or had no desire to make it.

If I mistake not, evidence was heard from witnesses from twenty to twenty-five years after the pre-emption right was sanctioned by the Government. Such a course tends greatly to embarrass land titles under the general land law. Every one knows that a man who endeavors to obtain a pre-emption,

must, in the nature of things, be a man of limited means, and incapable of maintaining an expensive suit at law; and it has always appeared to me the true policy to limit those questions to the land department of the Government. At all events, that they should be limited to the Federal tribunals, where, it may be presumed, the land department will have an uniform administration.

As this case now stands, I think the judgment of the Arkansas Supreme Court must be reversed on two grounds:

1. Because it has reversed the judgment of this court, entered by a majority of the members at December term, 1849, in these words: "The Supreme Court of the State, in sustaining the demurrers and dismissing the bill, decided against the pre-emption claimed by the representatives of Cloyes; and as we consider *that* a valid right, as to the fractional quarter on which his improvement was made, the judgment of the State court is reversed."

This is the judgment of this court as it now stands upon our docket. And

2. The judgment of the State court must be reversed, because it wholly disregarded the directions of this court in trying the issues transmitted to it.