### HOWE et al. v. PARKER et al.

(Circuit Court of Appeals, Eighth Circuit. October 12, 1911.)

No. 3,580.

*(Syllabus by the Court.)*

1. PUBLIC LANDS (§§ 106, 128*)—LAND DEPARTMENT OF THE UNITED STATES—PATENTS AND DECISIONS OF—HOW DIRECTLY ASSAILED.

Patents and decisions of the Land Department of the United States may be avoided and the legal title under them charged with a trust in favor of the rightful owner of the equitable title to the land on account of an error of law or a gross mistake of fact, or a fraud upon the officers of the department, by a direct suit in a court of equity for this purpose.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 104, 301, 302, 344; Dec. Dig. §§ 106, 128.*]

2. PUBLIC LANDS (§ 106*)—ERROR IN DECIDING WHETHER OR NOT THERE IS EVIDENCE TO SUSTAIN A CHARGE, REMEDIABLE.

Whether or not there is any evidence to sustain a charge, a claim, or a finding of fact in a controversy before the Land Department over the title to the public land is a question of law, and an error in the decision of that question which results in the issue of a patent to the wrong party is remediable in equity.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 104, 301, 302; Dec. Dig. § 106.*]

3. PUBLIC LANDS (§ 97*)—LAND DEPARTMENT—JURISDICTION MAY BE EXERCISED IN ACCORDANCE WITH LAW AND ESTABLISHED RULES, AND NOT OTHERWISE.

The Land Department has jurisdiction upon legal notice to divest entrymen of their equitable titles to lands within its power for fraud before the final order for the patent in accordance with the settled rules, practice, and decisions of that department.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

But the equitable title to land acquired by a lawful entry cannot be divested or affected by subsequent decisions of the Land Department or subsequent rules of practice therein contrary to a long line of decisions, or an established rule, or a settled practice at the time.

Neither the general nor the supervisory jurisdiction of the Commissioner or the Secretary is so arbitrary or unlimited as to permit such a course of action.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 288, 289; Dec. Dig. § 97.*]

**4.** PUBLIC LANDS (§ 106*)—LAND DEPARTMENT—SECOND CONTEST BARRED BY ADVERSE ADJUDICATION OR SAME CHARGE IN FIRST CONTEST.

It was a rule of reason, of law, and of property in 1898 established by a long line of decisions of the officers of the Land Department that, in the absence of fraud and of collusion between the parties, an adjudication that an informer's charge against a homesteader was unfounded was a bar to a contest against him by another informer on the same charge, and a decision to the contrary in that state of the law was an error of law.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 301, 302; Dec. Dig. § 106.*]

**5.** PUBLIC LANDS (§ 103*)—LEGAL NOTICE TO HEIRS OF DECEASED ENTRYMAN INDISPENSABLE—FIRST PUBLICATION LESS THAN THIRTY DAYS BEFORE HEARING A FATAL DEFECT.

Where the equitable title to land based on an adjudicated homestead entry of their ancestor and five years occupation and improvement rests in heirs of the entryman, it is indispensable to a divesting thereof by the Land Department that legal notice of the charge against them and its hearing be given them.

The publication of a summons or notice for the first time less than 30 days before the day of hearing is insufficient to give such legal notice by publication under rule 13 of the Land Department (31 Land Dec. Dept. Int. 530).

Statements of the appearance of parties in opinions of officers, in recitals of the proceedings, or by attorneys on pleadings and other documents in a case in which their appearance and authority to appear for them was never questioned or in issue. will not prevail on a demurrer over the averment of the parties that they never received legal notice of the proceedings, and never appeared or authorized an appearance therein in a direct proceeding to litigate the issue thus tendered.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 298, 299, 307; Dec. Dig. § 103.*]

**6.** PUBLIC LANDS (§ 30*)—ACTS OF MARCH 1 AND 2, 1889 (25 Stat. 759; 25 Stat. 1005) OPENING CREEK LANDS IN OKLAHOMA—DISQUALIFICATION OF HOMESTEADERS UNDER. .

The Act of March 1, 1889, and Act March 2, 1889 (Act March 1, 1889, c. 317, § 2, 25 Stat. 759; Act March 2, 1889, c. 412, § 13, 25 Stat. 1005), which prohibited entry upon and occupancy of any of the lands ceded by the Creek Nation by their agreement of January 31, 1889, until noon of April 22, 1889, and disqualified any one who violated this inhibition from entering any of the lands as a homestead, did not disqualify one who entered upon the ceded land after March 2 and prior to noon of April 22, 1889, but who made the race for the tract he sought from outside the ceded land after noon of April 22, 1889, unless it be shown that manifest disadvantage in the race for the land resulted to some qualified entryman from such entry.

They did not disqualify such an one who learned outside the ceded land from one who had acquired all the information he had or communicated prior to March 1, 1889, the description, character, and location of the tract of land therein which he subsequently entered and the best way to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

go to it so that he could go directly to and identify it without further aid or information.

They did not disqualify such an one with whom his informant agreed to meet him near the land and go with him to it and did so, where the entryman could as well have gone to and recognized the land from his previous information without the meeting and accompanying and the meeting and conduct gave him no advantage and subjected no qualified entryman to any disadvantage in the race for the land.

These acts of Congress may not be construed after the entries of lands thereunder to include within their prohibitions and disqualifications classes of persons or of acts that were not clearly within their unambiguous terms when the entries were made.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 48-50; Dec. Dig. § 30.*]

*(Additional Syllabus by Editorial Staff.)*

7. WORDS AND PHRASES—"SOONER."

A "sooner" in the parlance of Oklahoma is one who to the injury of other intending settlers enters on and claims land as his homestead before such entry and claim are effective to initiate a valid homestead under the acts of Congress.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 7, p. 6552.]

Appeal from the United States Circuit Court for the Western District of Oklahoma.

Bill in equity by Arthur Bruce Howe and others against Milton E. Parker and others. From a decree sustaining a demurrer and dismissing the bill, defendants appeal. Reversed and remanded.

Milton Brown and James M. Challiss (Waggener & Challiss and Flynn, Ames & Chambers, on the brief), for appellants.

J. H. Everest (T. F. McMechan, R. M. Campbell, and C. F. Smith, on the brief), for appellees.

Before SANBORN and SMITH, Circuit Judges, and WILLIAM H. MUNGER, District Judge.

SANBORN, Circuit Judge. This is an appeal from a decree which sustained a demurrer to and dismissed the bill of the complainants. On this demurrer the question whether or not the averments of the bill are true is, of course, not open to consideration, and the only question is whether or not the facts alleged state a cause of action for equitable relief. This is the case they state: Henry Howe, an aged minister of the gospel, made a homestead entry of the S. E. ¼ of section 27, township 12 N., of range 3 W., of the Indian Meridian, in Oklahoma, on April 23, 1889, built himself a house upon, and with his daughter, Sarah J. Howe, occupied and improved it as his homestead until, hounded by sooners under Act March 1, 1889, 25 Stat. 759, § 2, and Act March 2, 1889, 25 Stat. 1005, § 13, and 1006, § 14, and by informers under Act May 14, 1880, c. 89, § 2, 21 Stat. 141, and fought by the lawyers he had retained to defend him, he died intestate on June 17, 1893.

[7] A "sooner," in the parlance of Oklahoma, is one who, to the injury of other intending settlers, enters upon and claims land as his

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

homestead before such entry and claim are effective to initiate a valid homestead under the acts of Congress. The act of Congress of March 1, 1889, provided that the lands in the western half of the domain of the Creek Nation, where the land in controversy is situated, which were acquired by the United States by the Creek Nation's agreement and cession of January 31, 1889, should be disposed of in accordance with the laws regulating homestead entries, but that:

"Any person who may enter upon any part of said lands in said agreement mentioned prior to the time that the same are opened for settlement by act of Congress, shall not be permitted to occupy or make entry of such lands or lay any claim thereto." 25 Stat. 759, § 2.

Congress on the next day by the act of March 2, 1889, opened the land for settlement and prescribed terms on which homestead claimants might acquire it. That act provided that the land should be disposed of to actual settlers under the homestead laws only, and that:

"Until said lands are opened for settlement by proclamation of the President, no person shall be permitted to enter upon and occupy the same, and no person violating this provision shall ever be permitted to enter any of said lands or acquire any right thereto." 25 Stat. c. 412, § 13, page 1005.

On March 23, 1889, the President issued his proclamation that this land would be opened for settlement at noon of April 22, 1889. His proclamation contained these words:

"Warning is hereby expressly given that no person entering upon and occupying said lands before said hour of 12 o'clock noon of the twenty-second day of April A. D. one thousand eight hundred eighty-nine hereinbefore fixed, will ever be permitted to enter any of said lands or acquire any right thereto." 26 Stat. 1546.

About 2 o'clock and 30 minutes in the afternoon of April 22, 1889, Howe first entered upon the land here in dispute. He then claimed it as his homestead, and thereafter continued to reside upon and improve it. Two sooners, Miss Robb and Mr. Woodruff, had previously entered upon and claimed the land as their homesteads, respectively, but Howe made his homestead entry at the land office on April 23, 1889, and on May 9, 1889, and on May 21, 1889, respectively, these sooners filed affidavits that they were, respectively, the first to enter upon and occupy the land after noon of April 22d, and that Howe entered upon and occupied it before that time. Howe employed one John Burton, a practicing lawyer at Oklahoma City, to defend his claim against Robb and Woodruff, and disclosed to him as his lawyer the facts of his case, and thereupon Burton on September 6, 1889, turned informer and filed an affidavit of contest for himself under section 2 of the act of May 14, 1880, which gives the successful informer a preference right to enter the land of a homestead claimant. Burton set forth in that affidavit the charge which he and subsequent informers, Milton E. Parker on February 18, 1891, John T. Hornor on April 10, 1901, and others enlarged, that Charles Howe, the son of Henry Howe, entered upon and occupied the tract of land in question before noon of April 22, 1889, wrote Henry Howe that he had selected and was holding this tract for him, and when Henry Howe arrived at Oklahoma City on April 22, 1889, he, Charlie Howe, met and accom-

panied him to the land, and Henry Howe made his homestead entry with the knowledge of these facts.

There are attached to the bill in this case copies of the records and papers relating to the various contests against Howe and his heirs in the land office from which it appears that the proof was that the register and receiver found, and that the Commissioner of the General Land Office and the Secretary of the Interior affirmed the finding, that "Burton was a practicing attorney, and the conversation," in which Burton claimed that Howe admitted facts tending to support this charge, "took place in his office after he had been engaged as attorney for Howe to advise him in the case then pending against him by prior contestants. Burton took advantage of the information obtained in his professional capacity, and based a contest upon the same and attempted to procure the cancellation of his client's entry for his own benefit."

Chester Howe was a practicing attorney at Oklahoma City. He was no relation to the entryman, Henry Howe, and, after Burton filed his contest against the latter, he employed Chester as his attorney, and the latter tried on February 17, 1891, before the register and receiver, and won for him the cases of Robb, Woodruff, and Burton against him. The decision of the register and receiver in favor of Howe was rendered on June 19, 1891. On May 20, 1892, the commissioner reversed that decision, and awarded the land to Woodruff. Howe and Burton appealed. Burton also moved for a review. The Secretary considered the entire case and all the evidence offered by Burton, Robb, and Woodruff upon the merits, and on February 3, 1894, decided that Howe was not disqualified by the acts and communications of his son and himself, and that his homestead entry was valid. Burton moved the Secretary for a review and a rehearing of his case on the grounds that each of the Secretary's findings of fact and rulings of law were erroneous, and that he had just discovered that Henry Howe and Charles Howe, who was at that time a violator of the Act of March 2, 1889, and had selected the tract in controversy prior to April 22, 1889, agreed in the presence of Emile Bracht and Watson Bracht that Charles should hold the land until after the hour of opening, that he should put Henry Howe in possession thereof, that he should furnish money to improve it and that he should receive a deed of half of it from Henry Howe, that Henry Howe told these facts to W. T. McMichael and Fannie McMichael, that Henry Howe entered the ceded territory on April 21, 1889, and that James Shaw and John Jones saw him. Burton supported this motion by his own affidavit and the affidavits of Emile Bracht and Watson Bracht to the agreement, of W. T. McMichael and Fannie McMichael that Henry told them that Charles Howe directed him how to reach the land, and of James Shaw and John Jones that they saw Henry Howe go into the ceded territory on April 21, 1889. But on October 22, 1894, the Secretary denied the motion and closed the case. Burton had subsequent opportunity to present the testimony of the witnesses named in these moving affidavits. Emile Bracht and Watson Bracht were subsequently sworn and examined, but they refused to testify to the agree-

ment between the Howes which they and Burton set forth in these moving affidavits. Burton did not avail himself of his opportunity to call as witnesses W. T. McMichael, or Fannie McMichael, or James Shaw, or John Jones. The bill avers that the affidavits of these witnesses were untrue, and the subsequent course of the record sustains the averment.

When Secretary Hoke Smith denied this motion for review and rehearing and closed the case in favor of Howe on October 22, 1894, the sooners ceased, but the informers pursued the chase. The old minister, while alive, had established his integrity, his veracity, and the validity of his entry. But he was dead. His heirs had indeed succeeded under Rev. St. § 2291 (U. S. Comp. St. 1901, p. 1390), to his rights, but the defense of those rights had fallen on his unmarried daughter, Sarah J. Howe, who still lived upon his homestead, and section 2 of the act of May 14, 1880, seemed to the informers still to offer the land to those who might prove the dead clergyman a violator of the law and a perjurer, and they swarmed forth to blacken his memory and seize the prize. On June 7, 1897, when Sarah J. Howe made final proof of her homestead, three of them, Parker, Norman, and Fakes, had filed affidavits of contest on the same grounds which had been proved baseless in the lifetime of Henry Howe in the cases of Burton, Robb, and Woodruff, and the register and receiver refused to receive and forward her final proof because none of these informers had moved for a hearing or proved his alleged case.

There is an averment in the bill that Chester Howe, the attorney of Henry Howe in the trial of the cases of Robb, Woodruff, and Burton against him, before the register and receiver on February 17, 1891, conspired with Milton E. Parker, the patentee, to file Parker's affidavit on February 18, 1891, the next day after that trial, that he concealed the fact of this filing from Henry Howe, his client, until March, 1893, when Henry discovered it and charged him with it, that Chester then replied that Parker's affidavit was filed at his request, and that Parker's contest was a friendly one and would be dismissed, but that Henry doubted this statement, discharged Chester Howe as his attorney, and employed J. H. Everest who thereafter conducted his case, and that of some of his heirs through the contests in the land office and is now the leading attorney for Parker and other defendants in this suit. Chester Howe is not a party to this suit, and this charge against him, if it were unsupported by the records of the land office and he had had no opportunity to meet it, should not receive much consideration here. But the copies of the records in the land office which are presented with the bill disclose these facts: Burton made some charge of this nature against Chester Howe. Chester then made an affidavit in 1902 that he married a half sister of one of the contestants of Henry Howe, that he called Henry into his office and suggested that he retire from the case, and that Henry employ some other attorney on account of that relationship and that Henry at his suggestion, and not at Henry's request and without any indication of dissatisfaction, made the change of attorneys, and that he, Chester, had no connection with the case of Parker from that time until May or June, 1898, when, aft-

er a statement had been made by Mr. Everest, the attorney for some of the heirs of Howe, and Mr. Dilley, the register, that there was no objection to that course, he argued for Parker the motion to dismiss the latter's contest which some of the heirs of Howe had made. But whether Chester retired from Henry's employment at his own or at the latter's request, the records conclusively show that he was Henry's attorney; that he must necessarily have learned through that confidential relation the facts and the law of his case; that he was on intimate friendly terms with Milton E. Parker; that the day after he tried Henry's case against Robb, Woodruff, and Burton Parker's contest affidavit was filed; that this affidavit of Parker made the charge of the disqualification of Henry Howe to enter the land which had been made in the amended contest affidavit of Burton and had been tried by Chester Howe the day before; that Chester remained attorney for Henry Howe until March, 1893, but made no move to dismiss, or to try, or to dispose of in any way, Parker's latent claim; that he ceased to be the attorney of Howe in March, 1893; and that when the first motion was made to dispose of Parker's contest in May or June, 1898, he carried the information and knowledge of the facts and of the law upon the issue which Parker tendered that he had gained as attorney for Howe to the side of the identical issue he had been retained to defeat and used it to sustain the charge the contestants urged. He succeeded in defeating the motion to dismiss Parker's contest, he prepared Parker's petition to intervene in Burton's contest, and, after the two contests were consolidated, he acted as Parker's attorney in Washington. The vice of so gross a breach of trust cannot be extracted, nor can so perfidious a course be rendered fair, just, or right by the absence of objection by local land officers, or the silence of its helpless victims. Henceforth in this case the first two attorneys of the old clergyman were united in an endeavor to prove that their dead client was a perjurer and a violator of the law, and that the cause they had formerly espoused was unjust and unlawful.

On June 7, 1897, Sarah J. Howe, as a part of her final proof, had filed her affidavit that Ed Howe of Atchison, Kan., Charles Howe of Atchison, Kan., Nora Howe, a minor, of Oklahoma City, O. T., Sarah J. Howe, of Oklahoma City, O. T., Bruce Howe, of Council Bluffs, Iowa, Arminda Howard, of Grand Forks, N. D., Della Sullivan, of Chicago, Ill., and Olive Howe, of Omaha, Neb., were the sole heirs of Henry Howe. On March 29, 1898, Parker suggested the death of Howe, and on that day and on April 12, 1898, filed affidavits for and caused the publication of a summons to the heirs of Henry Howe, whose names were not specified, signed by the receiver of the land office, to appear on May 24, 1898, and furnish testimony concerning Parker's allegation that Henry Howe had made an illegal homestead entry of the land in question. Parker caused publication of these summonses to be made once in each week for four weeks commencing on April 28, 1898. On April 9, 1898, Sarah J. Howe, Charles Howe, and Ed Howe moved to dismiss the charge that Henry Howe had made an illegal entry under a collusive agreement with his son Charles, upon the ground that the issue on that charge was rendered res ad-

judicata by the decision of the cases of Robb, Burton, and Woodruff in 1894. 18 Land Dec. Dept. Int. 31. But this motion was denied. Complainants alleged that no notice of the hearing or trial, or of the subsequent proceedings in this case, except the publication of the summons in the manner hereinbefore stated, was ever given to Bruce Howe, Arminda Howard, Della Sullivan, or Olive Howe, four of the heirs of Henry Howe, and that neither of them ever personally appeared, or authorized any one to appear for them, in any contest proceedings subsequent to the death of Henry Howe. The three heirs, Sarah J. Howe, Ed Howe, and Charles Howe, appeared in those proceedings by J. H. Everest, after they had specially appeared and challenged them and their motion had been dismissed, and J. S. Jenkins appeared as attorney for Nora Howe, the minor. Parker's contest case was tried between him and the four heirs who appeared in November, 1898, and on April 18, 1899, the register and receiver decided that Howe was disqualified to make his entry by his relations with his son, Charles, when he entered upon the land. Sarah J. Howe, Nora Howe, Ed Howe, and Charles Howe, appealed to the commissioner, and this appeal was pending when in June, 1900, Parker was permitted on his motion to intervene in the case of Burton v. Howe, in which a rehearing had been granted on March 6, 1900, and thereupon the contests of Parker and Burton were consolidated. Burton's case had been decided and subsequently his motion for a review and a rehearing had been denied on October 22, 1894, by Secretary Hoke Smith. A change of administration had followed, and Secretary Bliss had succeeded Secretary Smith. Thereupon Burton presented to Secretary Bliss on the same affidavits the same motion for a rehearing which Secretary Smith had denied on October 22, 1894, and on March 6, 1900, that motion was granted.

The consolidated contests of Burton and Parker then proceeded to another trial before the register and receiver, who on March 22, 1902, decided that Howe was disqualified, and awarded the preference right to the land to Parker. The four appearing heirs of Howe appealed to the commissioner, and on August 2, 1902, he reversed the decision of the register and receiver, and awarded the land to the heirs of Howe. From this decision Parker appealed, and on August 5, 1903, the Secretary decided that Howe was disqualified, and awarded the preference right of entry to Parker. Thereafter Howe's entry was canceled. Parker entered the land as his homestead. It was patented to him on June 21, 1909, and is now held by him and the other defendants, all of whom took their rights to it after full notice of the claims and equities of the heirs of Howe. The complainants have succeeded to the rights of Henry Howe. They have set forth in their bill all the evidence that was presented to the Secretary when he rendered his final decision, and they pray that the defendants be decreed to hold the lands in trust for them on the grounds that upon the facts established by the evidence without dispute the Secretary fell into clear errors of law applicable to the case which caused him to issue the patent to the wrong party, and that through fraud or gross

mistake he also fell into a misapprehension of the facts proved before him which had the same effect.

The history of this case has been recited at length because one of the issues it presents is whether or not there was any evidence before the Secretary of the Interior to sustain his final decision that Henry Howe had violated the prohibitions of the acts of Congress, and disqualified himself from making a homestead entry of this land. In the absence of all evidence, the legal presumption in his case, as in that of every other man, was that he obeyed the law, that he was upright, honest, and truthful. The charge against him was tried in his lifetime and found to be baseless. The record of the final trial contains both competent and incompetent testimony. Of course, the Secretary disregarded the latter and gave heed only to the former. And when, under such circumstances a court must decide more than 10 years after his death in the face of the legal presumption of his honesty and truth and in the face of his successful refutation of the charge in his lifetime whether or not there was any evidence that he violated the law and attempted to perpetrate a fraud upon his government, it is important that the court should see clearly in the beginning the true purpose and meaning of the law, the circumstances surrounding the original defendant, the character of the parties to the controversy, the nature of the charge, the motives that induced the informers to make it, as well as the evidence to which they resorted to accomplish their purpose.

[1, 2] Whether or not the weight of evidence in substantial conflict sustains the one or the other side of an issue of fact is a question upon which, in cases within his jurisdiction, the final decision of the Secretary of the Interior is conclusive in the absence of fraud or gross mistake. But whether or not there is at the close of a final trial or hearing before him any evidence to sustain a charge or a finding of fact in support of it is in his and in every judicial and quasi judicial tribunal a question of law. Ward v. Joslin, 186 U. S. 142, 147, 22 Sup. Ct. 807, 46 L. Ed. 1093; United States Fidelity & G. Co. v. Board of Com'rs, 145 Fed. 144, 151, 76 C. C. A. 114, 121; Laing v. Rigney, 160 U. S. 531, 540, 16 Sup. Ct. 366, 40 L. Ed. 525; Southern Pacific Company v. Pool, 160 U. S. 438, 440, 16 Sup. Ct. 338, 40 L. Ed. 485; The Francis Wright, 105 U. S. 381, 387, 26 L. Ed. 1100; Clement v. Insurance Co., 7 Blatchf. 51, 53, 54, 58, Fed. Cas. No. 2,882; Delaware, Lackawanna & Western R. Co. v. Converse, 139 U. S. 469, 472, 11 Sup. Ct. 569, 35 L. Ed. 213. And an injurious error of the Secretary in finally deciding that question presents good ground for relief in equity. The Land Department of the United States is a quasi judicial tribunal, invested with authority to hear and determine claims to the public lands subject to its disposition and its decisions of the issues presented at such hearings are impervious to collateral attack. But its judgments and patents do not conclude the rights of claimants to the land. They rest on established principles of law and fixed rules of procedure, the application of which to each case conditions its right decision, and if the officers of the Land Department are induced to issue

a patent to the wrong party by an erroneous view of the law or by a gross mistake of the facts proved, or by a decision induced by fraud, the rightful claimant is not remediless. He may in a court of equity avoid the effect of the decision and the patent and charge the legal title derived from it with a trust in his favor. Lytle v. State of Arkansas, 22 How. 193, 203, 16 L. Ed. 306; Smelting Co. v. Kemp, 104 U. S. 636, 647, 26 L. Ed. 875; Moore v. Robbins, 96 U. S. 530, 536, 538, 24 L. Ed. 848; Bogan v. Edinburgh American Land M. Co., 63 Fed. 192, 195, 11 C. C. A. 128, 130; United States v. Winona & St. Peter R. Co., 67 Fed. 948, 958, 15 C. C. A. 96, 106; U. S. v. Northern Pacific R. Co., 95 Fed. 864, 870, 37 C. C. A. 290, 296; Cunningham v. Ashley, 14 How. 377, 14 L. Ed. 462; Barnard's Heirs v. Ashley's Heirs, 18 How. 43, 15 L. Ed. 285; Garland v. Wynn, 20 How. 6, 15 L. Ed. 801; Johnson v. Towsley, 13 Wall. 72, 85, 20 L. Ed. 485; Bernier v. Bernier, 147 U. S. 242, 13 Sup. Ct. 244, 37 L. Ed. 152.

A complete copy of all the evidence before the Secretary at the final hearing is made a part of the bill in hand, and the first question to be considered is, Was there any evidence that Henry Howe violated the acts of Congress of 1889 and disqualified himself as a homesteader? What was the purpose of Congress in adopting these acts? Their primary object was to give the ceded land to homesteaders, who should settle upon and occupy it, and not to subsequent informers, who had never sought to enter or to live upon it. Their secondary purpose was to prescribe such a method of initiating the homesteads that all intending settlers would have a fair chance to make them.

[6] What were the prohibitions of the acts that Henry Howe was charged with violating? That no person should enter upon any part of the ceded lands prior to noon of April 22, 1889 (Act March 1, 1889, 25 Stat. 759, § 2), that no one should "enter upon and occupy" any of those lands before that time (Act March 2, 1889, 25 Stat. 1005, § 13, and President's Proclamation, 26 Stat. 1546), and they declared that any person who committed either of these forbidden acts should be disqualified from entering any of the lands as a homestead, and they contained no other prohibition, or declaration of disqualification. Moreover, the true construction of these acts is not that it was the intention of Congress thereby to disqualify, and they did not disqualify all who entered the ceded land between March 1, 1889, and noon of April 22, 1889, but that "one who took part in the race for the land on the day of the opening was not prohibited from taking land because of a prior entry into the territory unless it be shown that manifest advantage resulted to the entryman from his previous going into the territory." Potter v. Hall, 189 U. S. 292, 300, 23 Sup. Ct. 545, 549 (47 L. Ed. 817), and cases there cited. In other words, the only prohibition of the acts was of an entry into the territory or upon the land by the homesteader between March 1 and noon of April 22, 1889, which should be shown to have placed some other qualified entryman at a manifest disadvantage in the race to enter the land on the latter day.

What was Parker's charge against Howe? It was that Charles F. Howe, the son of Henry Howe, entered upon and occupied a part of the ceded lands prior to noon of April 22, 1889, "and by virtue of said settlement fraudulently and illegally settled upon and held posses- sion of the above described tract" (the tract in controversy) "until some time in the afternoon of April 22, 1889, when he delivered possession of the same to said entryman, thereby giving said entryman an advantage, and preventing settlement and occupation of other and qualified settlers."

In the examination of the testimony these facts must be borne constantly in mind. This is a charge that Henry Howe disqualified himself from making this homestead entry by disobeying the acts of Congress, and no act or statement of Charles Howe which Henry Howe did not authorize or did not adopt as his own could disqualify him. The acts of Congress did not forbid the communication of information relative to the character, the location and the best way speedily to go from the lines of the ceded territory to each tract therein, nor did they prohibit any one from receiving such information, or disqualify any one from entering any of the lands who after their passage obtained such information from those who had acquired it before their passage. They did not disqualify any one who had entered the ceded territory, learned the character of the land and selected choice tracts for future lawful entry by themselves or others, and learned how to go to them from the lines of the land prior to March 1, 1889, from entering one of those tracts as a homestead, provided he entered the ceded territory from without and went to the tract and entered upon it as his homestead after noon of April 22, 1889. They did not disqualify one who entered the ceded territory and passed along the traveled routes through it from entering a part of the land as a homestead, provided he was outside the lines of the ceded land at noon April 22, 1889, and there was no proof that his prior entry upon the ceded lands resulted in manifest disadvantage to some qualified entryman. Potter v. Hall, 189 U. S. 292, 299, 300, 23 Sup. Ct. 545, 47 L. Ed. 817.

Now, let us turn in the light of these undoubted rules of law and of fact to the testimony before the Secretary. These facts were established without any conflict of testimony: Henry Howe was living at Manhattan, in the state of Kansas, in April, 1889, when he received from his son Charles a letter advising him to enter some of the land in the ceded territory as his homestead. Thereupon about April 16, 1889, he went from Manhattan on a railroad train through the ceded land to Purcell, a town south of the ceded land, and then in the Indian Territory, where he remained until after noon of April 22, 1889. He did not enter upon or occupy or see the tract in controversy on this journey, nor did his passage through the ceded land give him any advantage over other intending settlers in obtaining it. During his stay at Purcell his son Charles met and camped with him there a part of the time. The tract in dispute was about a mile and a half northeast of Oklahoma station. It had a grove on or near it,

and was the only tract in that vicinity that had a spring upon it, so that it was easily described and recognized. Charles was a photographer, and he went to Oklahoma station the last of January, or the 1st of February, 1889, became one of about 100 boomers who were seeking land about that station, and remained there until the acts of Congress of March 1st and 2d opening the land were passed, and went out of the ceded territory. Prior to March 1, 1889, he had learned all that he ever knew about the character, the location, and the best way to go to this land from Purcell. Prior to March 1, 1889, he had selected this land for a homestead claim, had commenced to make a dugout and had placed some logs upon it, but the dugout was destroyed by the soldiers, and he never occupied the land or made any mark or improvement upon it between March 1, 1889, and his father's entry upon it about 2:30 in the afternoon of April 22, 1889. During his stay with his father at Purcell before April 22, 1889, he so clearly described to his father the tract in question and told him so accurately how to go to it from Oklahoma station that Henry Howe could and did go directly to it from that station, recognize, enter upon and claim it as his homestead without need of any further direction or assistance. Henry Howe took the first train from Purcell on the afternoon of April 22, 1889, arrived at Oklahoma station about 2:10 p. m., walked directly to the tract, entered upon, and claimed it as his homestead. When he was about half way from the station to the land Charles met him and went with him to the tract, but his meeting and accompanying him gave Henry Howe no advantage or assistance, because the information that Charles had given him at Purcell was ample to enable him to go directly upon, to enter, identify, and claim it as his homestead. When Henry Howe arrived upon the land, the two sooners, Miss Robb and Mr. Woodruff, had already entered upon, staked, and claimed it for themselves, respectively, and there was no evidence whatever before the Secretary tending to show that any qualified entryman, except Henry Howe, ever sought or desired to enter this land, or was prevented or hindered by the entry or occupancy of Henry Howe, or by any other act of Henry Howe or Charles Howe from so doing on April 22, 1889, or at any time thereafter prior to Burton's perfidious filing of his contest affidavit on September 9, 1889. Between January 15, 1889, and March 1, 1889, there were about 100 boomers at Oklahoma station seeking land. Of this company were Charles Howe, Emile Bracht, Watson Bracht, Harry Bacon, George Sebastian, and Henry Ridenour. Each of them investigated the lands in the vicinity of that station and selected his claim or claims before March 1, 1889, and they agreed among themselves prior to that time not to take each other's claims, but to protect them. The testimony is conflicting whether the land here in question was known among them as the claim of Charles or as a claim he had selected for his father, but the proof is positive, and there is no evidence to the contrary, that after March 1, 1889, Charles made no mark or improvement on the tract, and neither he nor his father did any act to prevent any other person from taking it on April 22, 1889, before Henry Howe entered it at 2:30 in the afternoon of that day, and the fact that Miss Robb and Mr.

Woodruff had then entered upon and taken possession of it confirms the testimony of Charles Howe and Watson Bracht that Charles Howe did not mark or improve this tract after March 1, 1889. They testified that Charles selected another tract of land for himself, which cornered on the tract in dispute, that Bracht had selected a tract half a mile farther north, that they camped together at Purcell until about the 20th of April, and then returned to the vicinity of their claims where they concealed themselves until noon of April 22d, when they entered upon these tracts, respectively, claimed and commenced to improve them. They testified that Charles Howe did not between April 19th and 2:30 p. m. April 22d, enter upon, stake, or do any other act to hold the land entered by Henry Howe, and no witness came to testify that he did.

But Burton, Henry Howe's first attorney, after his contest had been decided against him in February, 1894, by Secretary Smith, in his affidavit for a review and rehearing which was made on March 14, 1894, about nine months after Henry Howe had died, swore that Henry Howe had shown him in March, 1890, a written statement of facts which Howe said was a true statement, that this statement was signed by Howe, and that after stating that Charles Howe, who was called "Doc" in the alleged statement, had given him specific instructions how to go to the tract so that he "could as well have gone there without him as with him"; that after he had gone a mile from the station he saw "Doc" 30 yards from him facing him; that "Doc" started off eastward and he followed him, but did not overtake him until they got within a few rods of the west line of the claim, proceeded in this way:

"Doc stopped to talk with a man who thought he had a flag upon the claim, but the line was a few rods east of where the flag was up. Then Doc and that man, a stranger, walked to the spring. Doc then went to a lady on horseback and pulled up his stake and read the name on it. Doc said she was Miss Robb, and that she pulled up 'my (Doc's) stake and took it away and put her stake in the same place that I had mine.' Doc then went four rods north and pulled up another stake and read the name, Frank Woodruff, and said, 'He is a sooner.' Doc then said, while standing on the rock near the spring, that he had been down there before those other stakes were stuck and stuck his stake with the intention of holding the claim, and Doc then said to me, 'Father, I will not try to hold this claim, but will see what I can do with my own.'"

Winn, a lawyer and partner of Burton, had also made an affidavit for Burton on March 10, 1894, that he was present when Howe presented that statement; that Burton copied it; that the copy was correct; and that the copy of Burton's copy in Burton's affidavit was correct. This old affidavit of Burton was fished out of the records of the Land Office at the final trial below and shown to Burton, and he then testified that he lost his copy of the original statement long ago, and that he cared nothing about it after he had made this affidavit. He was then asked if the purported copy in his affidavit was a true copy of the original, and, over objections, answered, "Yes, sir," and thereupon over objections Howe's alleged statement in this old affidavit of Burton was introduced in evidence. Winn was shown the alleged copy of Howe's statement found in Burton's old affidavit, and, after testifying that he did not know where the original or the copy of

it made by Burton was, was asked if the statement in Burton's affidavit was a copy of the original, and over objections answered that it was. Thereupon over similar objections the agreement in Howe's affidavit was introduced in evidence. It is clear that the testimony regarding this alleged statement of Henry Howe and the statement itself were not competent evidence (1) because the original of the agreement, if there ever was one, was not produced, no proof was offered that it was lost or that any demand for it had ever been made on the heirs of Henry Howe who Burton swore last had it, or that any search for it among them where it would be most likely to be found had ever been made; (2) because Burton and Winn could not lawfully first refresh their memories by reading an alleged copy of a copy of the original and then testify simply whether or not it was a true copy of the original, but they could lawfully refresh their memories only from memoranda made by them at the time the original was before them, and then could only testify orally from their recollection thus refreshed; and (3) because the purported statement of Howe was made by the decedent personally to Burton, then a party to the contest against him, and the adverse parties at the trial were the heirs of that decedent. Compiled Laws of Oklahoma, § 5841, p. 1263; Rev. St. U. S. § 858 (U. S. Comp. St. 1901, p. 659); Mather et al. v. Hackley's Heirs, 19 Land Dec. Dept. Int. 48, 57. The testimony concerning this purported statement of Howe therefore does not rise to the dignity of evidence and that statement should be disregarded.

If, however, it were conceded that this statement was evidence of the truth, it contains no evidence tending to disqualify Henry Howe. The proof is uncontradicted that at 2:10 p. m. April 22, 1889, Charles Howe had entered upon, occupied, and was claiming another tract as his homestead. Concede that he had been on Henry Howe's claim and placed his stake there before those of Robb and Woodruff were established, and Mrs. Wilkerson, formerly Miss Robb, testified that she found a stake there marked "Charlie Howe" two or three minutes after noon of April 22d, when she entered upon the tract. When did Charles Howe put that stake there? Not on April 22d, for Miss Robb was there two or three minutes after noon and Emile Bracht and Charles Howe both testified that Howe was not within one-third of a mile from that tract before 2 p. m. on that day, and that he never marked or improved that tract after March 2, 1889, and there is no evidence to the contrary. His stake and his intention to hold Henry Howe's tract were therefore prior to March 2, 1889, when the testimony is that he marked and started to improve it. And those acts could not disqualify Charles himself, much less Henry Howe, who, according to the evidence, had no part or lot in and knew nothing of this staking or holding until after he had lawfully entered upon the land. That they gave Henry Howe no manifest advantage over others in the race is demonstrated by the prior entries of Robb and Woodruff, by the fact that Charles Howe was a sooner and disqualified, and by the absence of any evidence that any qualified entryman was hindered by them. Charles Howe's removal of the stakes of Robb and Woodruff and his public declaration that he would not, and that his father might,

take the tract, were equally immaterial. He had no claim to the tract because he was disqualified by his soonerism and by the fact that he had already made and was maintaining a homestead claim to another tract. And the removal of the stakes of Robb and Woodruff had no effect whatever because their rights vested when they set those stakes and entered upon the land, and no subsequent removal of them by a stranger could destroy or diminish them.

The following testimony is also cited and relied upon as evidence of Henry Howe's disqualification:

Emile Bracht testified that before March 1, 1889, it was understood between him and Charles Howe that the land in controversy was to be occupied by his father; but the fact, if it were a fact, and Charles Howe testified that it was not, that Charles selected this tract for his father and started to build a dugout on it before March 1, 1889, could not disqualify his father from entering it because the latter did not enter in violation of the prohibition within the inhibited time. There is no evidence that he authorized or was aware of these acts of Charles which were all prior to his arrival at Purcell, and because selections and markings before the acts of March 1st and March 2d were passed, disqualified no one who complied with those acts after they were passed. Emile Bracht also testified that the boomers at Oklahoma station prior to March 2, 1889, agreed to protect each other's claims; that they kept no one off of the land in controversy on the opening day; that he and Charles Howe were together near the northeast corner of the N. W. ¼ of section 27, which is about a half a mile north of the S. E. ¼ of section 27, which is here in controversy, at noon of April 22, 1889, and that each then stepped onto the land he claimed and commenced to put up a tent; that Charles claimed the N. W. ¼ of section 27, and was not on the S. E. ¼, the land in question, that forenoon; that they stayed at their tents until the first train from Purcell whistled, about 2 o'clock p. m., and then Charles said he must go to meet his father and started south.

George M. Sebastian testified that it was about 14 or 15 miles from the east line of the ceded land to the tract in controversy; that he made the race from the east line on horseback to the quarter section half a mile north of the northwest corner of the land in dispute, and arrived there about 2 p. m.; that there were plenty of people there when he arrived, and that a man could ride on horseback from the east line to the land in controversy in from an hour and a half to two hours. He also testified that Henry Howe told him that Charles located him on his claim; that he was to meet him at the land, and did meet him about half way from the train to the land; that he went with him to the tract, and that Charles told him some time after the opening that he guessed he would give up his claim, but that he had his father located on one all right; that his father came in on the train and he met him about half way from the depot to the grove and took him up there and located him. F. M. Ridenour testified that in 1893 Henry Howe told him that he got off on the east side of the train and started in a northeasterly direction as near as he could to comply with the understanding he and Charles had as to the direction to get to the

claim in question; that it had been so minutely described to him that he knew he was on it before he was 50 yards from the west side; that he went on down the hollow to the spring; that after he had gone a mile or more from the station toward the land, or nearly to the grove, he saw Charles coming towards him, but he kept his direction straight ahead, when Charles turned and went and met him about the center of the grove. H. S. Summers testified that he was one of the boomers who were in Oklahoma three months before the opening; that they then all had claims picked out, and knew each other's claims and respected each other's rights, and were organized so far that they would not go on another man's claim; that he knew Charles Howe three months before the opening and Charles had selected the land in controversy as his claim; that he was with Charles at Purcell a week before the opening, and that he left Charles there, and that on April 24, 1889, he asked Charles why he did not go up to file, and he said that he did not have to go up; that he had got his father on his claim, and that he could take care of it for himself. Harry Bacon testified that he was one of the boomers; that some weeks before the opening the land in question was selected by Charles Howe and was generally known by the boomers to be selected for his father, Henry Howe, and Charles made improvements on the claim for his father; that he was a sooner and concluded he could not hold his claim about 2 in the afternoon of April 22d, and that he would go to town and get some town lots; that Charles Howe went with him, and, when about half way, Charles stopped suddenly and said he must go to meet his father; that he had made arrangements to meet him and show him the claim in question; and that the next time he saw him he said he got his father there all right. Charles Howe testified that he selected this land for himself prior to March 2, 1889, dug a hole in the bank and hauled some logs for a dugout, but that he never made any marks on it between March 2 and noon of April 22, 1889; and that he never kept any one from settling upon or laying claim to the land on or after that day. He testified that he learned all he knew about the land and the way to it prior to March 2, 1889, and that he so described it and the way to go to it to his father at Purcell between April 16 and April 22, 1889; that his father needed no further assistance to go to it and to identify it; that his father gained no assistance directly or indirectly by his presence on the ceded land between March 2 and noon of April 22, 1889; that he thought his father could comply with the law and secure this claim, and he could go in sooner and get a more valuable claim for himself, and so he left his father at Purcell and went into the ceded territory and near to the line of his claim, the northwest quarter of section 27, before noon of April 22d and just after noon entered upon it, claimed it as his homestead, and commenced to put his tent up; that about 2:15 p. m. he was walking to town with Bacon, saw his father go to his claim and went to and with him to it, but that he never told Bacon he had to meet his father to show him the land.

All the evidence that counsel claim tends to show a disqualifica-

190 F.—48

tion of Henry Howe has now been recited. Much of it was contradicted, but we disregard all conflict and concede for the purposes of this decision that the statements of the witnesses against the heirs of Howe were true, but where in all these statements is there any evidence that Henry Howe was disqualified?

He was not disqualified by the acts of Charles Howe in selecting, staking, and improving the tract in controversy prior to March 1, 1889, (1) because those acts could not disqualify any person who made the race for the land from without the ceded territory after noon of April 22, 1889, and Henry Howe made that race in exact conformity to the acts of Congress; (2) because there is no evidence that he knew of or authorized those acts when they were done, or that he afterwards ratified them as his own; and (3) because those acts were not shown to have conferred any manifest advantage upon him or to have subjected any qualified entryman to any disadvantage in the race for the land.

He was not disqualified by his acquisition from Charles after April 15, 1889, and before April 22, 1889, of an accurate description of the land, and the way to go to it (1) because Charles acquired all that information prior to the passage of the acts of Congress and those acts contained no prohibition of the acquisition of such information or the communication of it, but their purpose was to spread such knowledge to all who desired to make homesteads on the land to induce them to do so; and (2) because such information gave Henry Howe no manifest advantage over other intending settlers who were free to acquire like information from all who had it.

He was not disqualified by the presence and acts of Charles Howe within the ceded land after March 1, 1889, and before 2 p. m. of April 22, 1889, (1) because the evidence is positive that during that time he made no mark or improvement on this land, and did no act to prevent, and no act that did prevent or hinder, others from entering or occupying the land after noon of April 22, 1889, there is no evidence to the contrary, and the verity of this evidence is demonstrated by the entries and occupancy of the land as a homestead by Robb and Woodruff immediately after noon of April 22, 1889; (2) because the law prohibited any intending settler from entering and occupying the tract between March 1, 1889, and noon of April 22, 1889, and no prevention of such entry and occupancy during that time could under that law have placed any intending settler at a disadvantage or given any intending settler an advantage; and (3) because there is no evidence that Henry Howe derived any advantage, or that any qualified entryman suffered any disadvantage, in the race from the presence or acts of Charles Howe during this time, and there is affirmative proof to the contrary both in direct testimony and in the established facts that Robb and Woodruff entered and occupied the tract before Henry Howe arrived upon it.

He was not disqualified because Charles Howe agreed with him at Purcell after April 16 and prior to April 22, 1889, that after he should arrive at Oklahoma Station Charles would, and he did, meet him and conduct him to the land, (1) because the evidence is positive and un-

contradicted that that meeting and conduct gave him no aid or advantage in the race; that prior to March 2, 1889, Charles Howe acquired all he ever knew about the land and the way to go to it, and after April 16, 1889, and before April 22, 1889, out of that store of information described to Henry Howe the tract so graphically and the way to go to it so accurately that Henry could go to it as directly and identify it as readily without as with the meeting and conducting; (2) because the only effect of the agreement to meet, of the meeting, and of the conducting was to communicate to Henry Howe information about the location and the best way to go to the land which Charles had acquired prior to March 1, 1889, and which he might lawfully communicate and Henry Howe might lawfully receive without disqualification; (3) because the evidence is positive and uncontradicted that Charles was not sent into the ceded land by his father prior to April 22, 1889, to meet or conduct him, but that he went on his own motion to enter and claim another tract of land for himself; and (4) because there is no evidence that any qualified entryman or intending settler suffered any disadvantage or that Henry Howe obtained any advantage from this agreement to meet, the meeting, or the conducting, but there is positive evidence to the contrary and undisputed proof that Miss Robb and Woodruff entered and occupied the land after noon of April 22, 1889, before Howe, that equestrians could have reached it from the east line of the ceded land between noon and 2 in the afternoon, and that Howe did not arrive upon it until about 2:30 in the afternoon of April 22d.

There is no evidence that he is disqualified in any other way. All the evidence in this case has been read and reread, analyzed, digested, and searched by each of the members of this court. All of it that is material has been recited and reviewed here to the end that its character and effect might be clearly perceived, and for the reasons which have now been stated at length this court is unanimously of the opinion that there was no evidence before the Secretary of the Interior or the officers of the Land Department at the final trial there of the fraud or disqualification of Henry Howe, and that the Secretary in the press of his official duties unwittingly fell into an error of law when he failed to so hold and to give to Henry Howe his patent upon that ground.

In Smith v. Townsend, 148 U. S. 490, 497, 13 Sup. Ct. 634, 37 L. Ed. 533, the Supreme Court declared that the acts of Congress under consideration here were not penal statutes, and that the portions which described the disqualifications for entry should be liberally construed in order that no one be permitted to avail himself of the bounty of Congress unless evidently of the classes Congress intended should enjoy that bounty. But in the case at bar the attempt is to extend the disqualifications to a new class of persons and acts not specified in the statutes and to punish with disqualification an entryman who falls clearly within the qualified classes described in the statute because he is alleged to have violated prohibitions and incurred disqualifications which the acts of Congress do not contain. Because any extension of the disqualifications prescribed by these acts to classes not there

clearly specified, has the like effect as the extension of a penal law to persons and acts not within its terms, the prohibitions and disqualifications of these statutes should be interpreted by the familiar rule that, where the statute is before the event plain and unambiguous, the courts may not lawfully extend it to a class of persons who are excluded by its terms, nor by interpolation or construction after their commission make acts violations thereof which were not clearly such by the expressed will of the legislative department when they were done. United States v. Wiltberger, 5 Wheat. 76, 96, 5 L. Ed. 37; United States v. Germaine, 99 U. S. 508, 510, 25 L. Ed. 482; United States v. Ninety-Nine Diamonds, 72 C. C. A. 9, 12, 13, 139 Fed. 961, 964, 965, 2 L. R. A. (N. S.) 185; Martin v. United States, 168 Fed. 198, 202, 93 C. C. A. 484, 488; Field v. United States, 137 Fed. 6, 8, 69 C. C. A. 568, 570; United States v. Clayton, Fed. Cas. No. 14,814; In re McDonough (D. C.) 49 Fed. 360; Maxwell v. State, 40 Md. 293; Alexander v. Worthington, 5 Md. 472; Smith v. State, 66 Md. 215, 7 Atl. 49; Tynan v. Walker, 35 Cal. 634, 95 Am. Dec. 152; Lake County v. Rollins, 130 U. S. 662, 670, 9 Sup. Ct. 651, 32 L. Ed. 1060; Swarts v. Siegel, 54 C. C. A. 399, 117 Fed. 13; St. Louis Merchants' Bridge T. Ry. Co. v. United States (C. C. A.) 188 Fed. 191, 193. The actual decisions of the Supreme Court are in accord with this construction. That court has never extended, but has restricted, the expressed disqualifications. By the terms of the acts any one who entered the ceded land between March 1 and April 22, 1889, was disqualified, but the Supreme Court has held that one who entered on or passed through the ceded land during the inhibited period was not disqualified if on the day of the opening he made the race for the land from without and his prior entry was not shown to have given him a manifest advantage. Potter v. Hall, 189 U. S. 299, 300, 23 Sup. Ct. 545, 47 L. Ed. 817. Howe passed through the ceded lands on a railroad train about April 16, 1889. But he never otherwise entered upon or occupied any of them prior to 2:30 in the afternoon of April 22, 1889. He did not violate any express prohibition of the acts nor incur any express disqualification thereof. He acted, he was compelled to act, under the statutes as they read in 1889, without the benefit of subsequent interpretations, and they ought not now to be construed to disqualify him for acts which they did not then plainly forbid.

In reality the charge against the old entryman was that he attempted to defraud his government of this land, a charge that clear proof alone could sustain. That charge was founded in and carried through the Land Department by the avarice, zeal, and perfidy of those whom he had retained to defeat it. They raked together and produced a volume of testimony and records, but no evidence to sustain the charge that Charles F. Howe "fraudulently and illegally settled upon and held possession of the above described tract until some time in the afternoon of April 22, 1889, when he delivered possession of the same to said entryman, thereby giving said entryman an advantage and preventing settlement and occupation by other and qualified settlers," none that Henry Howe ever defrauded or attempted to defraud his government, and we find no fault in him.

[3] Henry Howe died on June 17, 1893, and his right to his home-stead was then granted to his eight heirs by section 2291 of the Revised Statutes. Burton's case against Howe had been tried and was pending before the Secretary, and on February 13, 1894, he decided it in favor of Howe, and on October 22, 1894, he denied Burton's motion for a review and a rehearing and closed the case. Howe and his daughter had lived upon and occupied the tract more than five years when this motion was denied. Conceding the general jurisdiction of the Land Department over the disposition of the tract in question thereafter until patent, and that the successor of Secretary Smith had the same power to review and rehear Burton's case that his predecessor had, nevertheless the equitable title of these heirs to this land had then vested in them by reason of their father's adjudicated entry and the requisite occupation and improvement thereof for five years. The officers of the Land Department had jurisdiction to divest that equitable title for fraud by proceedings and decisions according to law after legal notice to all the heirs and an opportunity for them to be heard upon the charges made against them, and not otherwise. Neither the general jurisdiction nor the supervisory power of the commissioner, or of the Secretary is arbitrary or unlimited. The effective exercise of each is conditioned by established rules of law. The settled rules and practice and the uniform decisions of the department constitute both rules of law and of property, and equitable titles in entrymen cannot be destroyed by the Land Department in violation of them. System, order, and the uniform application of the established rules and practice of the department to all litigants alike are as essential to the administration of justice in the Land Department as in the courts. What a farce the attempt to secure or protect rights in any judicial or quasi judicial tribunal must become if its rules and decisions are ignored or applied to each case as it arises at the arbitrary will of the officer who presides. Equitable titles of claimants to lands under the acts of Congress may not be annulled by the Land Department in violation of its settled practice, or of a rule of law and of property established by a long line of decisions of its officers, nor without legal notice to the parties in interest and an opportunity to be heard. Germania Iron Co. v. James, 89 Fed. 811, 817, 818, 32 C. C. A. 348, 354, 355; James v. Germania Iron Co., 107 Fed. 597, 602, 46 C. C. A. 476, 481; Shreve v. Cheesman, 69 Fed. 785, 792, 16 C. C. A. 413, 419; Cornelius v. Kessel, 128 U. S. 456, 461, 9 Sup. Ct. 122, 32 L. Ed. 482; Love v. Flahive, 205 U. S. 195, 199, 27 Sup. Ct. 486, 51 L. Ed. 768.

[4] In 1898 it was a rule of reason of law and of property established by a long line of decisions of the Secretary of the Interior and subordinate officials that an adjudication by the Land Department after trial without collusion between the parties that a charge made by an informer against an entryman was unfounded was a bar to a contest against the latter by another informer on the same charge. Parker v. Gamble, 3 Land Dec. Dept. Int. 390; Reeves v. Emblen, 8 Land Dec. Dept. Int. 444, 445; Samuel J. Bogart, 9 Land Dec. Dept. Int. 217, 218; Busch v. Devine, 12 Land Dec. Dept. Int. 317; Gray v. Whitehouse, 15

Land Dec. Dept. Int. 352; Ferguson v. Daly, 14 Land Dec. Dept. Int. 245, 247; Joseph A. Bullen, 8 Land Dec. Dept. Int. 301, 303; George F. Stearns, 8 Land Dec. Dept. Int. 573, 576; Gage v. Lemieux, 8 Land Dec. Dept. Int. 139; Drury v. Shetterly, 9 Land Dec. Dept. Int. 211; United States v. Alexander, 11 Land Dec. Dept. Int. 507. The Secretary fell into a controlling error of law when he disregarded this rule and sustained the denial by the register and receiver in April, 1898, at a time when the case of Burton stood, and had stood for more than three years, adjudicated and closed against him, of the motion of some of the heirs of Howe to dismiss the charge of collusion and agency in the contest affidavit of Parker on the ground that it was the same charge, as it was in fact, that had been made by Burton and, after trial on the merits, had been adjudicated in favor of Howe. In Brooks v. McBride, 35 Land Dec. Dept. Int. 441, 443, Secretary Hitchcock himself, after stating that former adjudication could not be pleaded as a bar to the jurisdiction of the Land Department to re-examine and to inquire into any question affecting the right to the public lands when necessary to protect the rights of the government or of parties seeking to acquire title thereto, said: "The Department will, however, apply the doctrine of former adjudication as an equitable bar between parties to a controversy who are seeking to acquire title to the public land, where equity and justice demand it, and to prevent vexatious litigation." Where did equity and justice ever demand it more forcibly, where was it ever more necessary to prevent vexatious litigation than in the case in hand? The Land Department had previously repeatedly applied it in such cases. The opposite rule which the officers followed renders it impossible for a homesteader ever to procure title to a tract of land which rapidly increases in value after its entry because under it successive informers in turn may make and try the same charge against him until time shall be no more. The case in hand well illustrates the error and injustice of such a ruling. It was about five years after Howe's entry before the contest of the first informer, Burton, was decided against him by the Secretary. Then Parker pressed the same charge, and it was about 14 years after Howe's entry when the Secretary sustained it. It is perhaps fortunate for the heirs of Howe that he did so, for, if the Secretary had decided in their favor, his decision would have been of no benefit to them under this ruling, for there were at least three more informers waiting to try this charge against them in turn and doubtless many more would have followed. The reasonable rule, the established rule of law and of property on this subject was that applied in the cases cited above, and it was error to refuse to apply it to this case.

[5] Legal notice to, or the authorized appearance of, each of the heirs of Howe in the subsequent proceedings after the death of their father was indispensable to the requisite jurisdiction of the Land Department over the persons and property here in question to enable it to divest or affect the equitable title or rights of the heirs to this land. The complainants allege that Burton by false statements and affidavits that newly discovered evidence had been found by him and by deceiving a subsequent Secretary into the belief that Charles

Howe's deposition had not been considered by Secretary Smith when he decided Burton's case, procured a rehearing of that contest from a subsequent Secretary about six years after a like motion on the same affidavits had been made before and decided adversely to him by the former Secretary in 1894, and that all this was done after the death of Howe without notice to his heirs of the motion or of the rehearing thereon. There is in the record an affidavit of Burton that he served his motion papers on Eugene Everest, and that Eugene was attorney for Sarah Howe, the administratrix and the heirs of Howe, and there is a written acceptance of service signed by "J. H. Everest, Atty. for Sarah J. Howe, Ed Howe and Chas. Howe, a part of the heirs of Henry Howe, dec'd." But the statement in an opinion of an officer or on a pleading or other paper by an attorney that he appears for a party or the affidavit of the opposing party that he served a notice on the attorney for a party in a case in which the question of the attorney's authority is not questioned or litigated is insufficient to overcome the positive averment of the party himself in a direct proceeding to question the authority that he had no notice and did not appear in the case, and the record in this case fails to satisfy that the averments of the bill in regard to this motion are not true and material. A denial at least is requisite to meet them and to avoid the serious results to which they lead.

The complainants also alleged that they were not legally notified, that five of them never appeared or took any part in the proceedings in Parker's contest, and that the other three appeared only after their special appearance and challenge of the proceedings was overruled. The records of the Land Department disclose the fact that Parker instituted proceedings to obtain service on the heirs of Howe by publication, but that he failed to do so because the notice was not first published "at least thirty days prior to the day fixed for the hearing" as required by rule 13 of the Department (31 Land Dec. Dept. Int. 530), which was in force in 1898. Counsel for the appellees insist that all the heirs of Howe appeared in the subsequent proceedings in those cases, and they call attention to various places in the record where attorneys before the commissioner and the Secretary signed their briefs "Attorneys for Defendants" and "Attorney for the heirs of Howe," and the places in the record and in the opinions of officers where there are recitals that counsel for the defendants or counsel for the heirs of Howe took some action. All these recitals, however, were made in the absence of any question of the authority of these attorneys, and they are certainly not sufficient to overcome the positive averment of the bill that the heirs Arthur Bruce Howe, Della Howe Sullivan, Ollie Howe Cole, and Minnie Howe Howard never received notice and never appeared in any of the proceedings in these cases after 1894. Support for this allegation is derived from the fact that the record shows that in the commencement of the proceedings after 1894 Mr. Everest, who conducted the trial, expressly limited his appearance to an appearance for "Sarah Howe, Ed Howe and Chas. Howe, a part of the heirs of Henry Howe," and that he appeared specially for them to oppose proceedings on the ground that jurisdiction had not been obtained over

all the defendants. There are other places in the record where he limits his appearance to one for these three heirs and none where he expressly appears for the four who have been mentioned. After proceedings had been instituted and were proceeding, it was not unnatural for attorneys to sign for the defendants or for the heirs of Howe, relying upon the limitation in their first appearance to determine what defendants and what heirs they represented.

Attention is called to an averment in the bill that these four heirs conveyed their interest in the land to Sarah J. Howe between June 7, 1897, and July 30, 1908, when she died, but there is nothing in the bill to show that they conveyed this interest before the final decision in favor of Parker in 1903, and the averment that the Land Department never acquired jurisdiction of the four heirs mentioned must be sustained until it is denied by answer or by proof. Whether or not the averments of the bill are sufficient to overcome the recitals of appearance of the other four heirs is immaterial now and is reserved for consideration and determination, if that should be necessary, after the hearing on the merits.

The case presents other questions of law, but none which will become material if the views already expressed are sustained by the evidence at the hearing, and it is unnecessary to prolong this opinion by discussing them. The bill states a good cause of action in equity, and the decree below is reversed, and the case is remanded to the Circuit Court, with directions to permit the defendants to answer